*263 OPINION OF THE COURT
FISHER, Circuit Judge.
This case arises from an antitrust action brought by ZF Meritor, LLC (“ZF Meritor”) and Meritor Transmission Corporation (“Meritor”) (collectively, “Plaintiffs”) against Eaton Corporation (“Eaton”) for allegedly anticompetitive practices in the heavy-duty truck transmissions market. The practices at issue are embodied in long-term agreements between Eaton, the leading supplier of heavy-duty truck transmissions in North America, and every direct purchaser of such transmissions. Following a four-week trial, a jury found that Eaton’s conduct violated Section 1 and Section 2 of the Sherman Act, and Section 3 of the Clayton Act. Eaton filed a renewed motion for judgment as a matter of law, arguing that its conduct was per se lawful because it priced its products above-cost. The District Court disagreed, reasoning that notwithstanding Eaton’s above-cost prices, there was sufficient evidence in the record to establish that Eaton engaged in anticompetitive conduct — specifically that Eaton entered into long-term de facto exclusive dealing arrangements— which foreclosed a substantial share of the market and, as a result, harmed competition. We agree with the District Court and will affirm the District Court’s denial of Eaton’s renewed motion for judgment as a matter of law.
We are also called upon to address several other issues. Although the jury returned a verdict in favor of Plaintiffs on the issue of liability, prior to trial, the District Court granted Eaton’s motion to exclude the damages testimony of Plaintiffs’ expert. The District Court also denied Plaintiffs’ request for permission to amend the expert report to include alternate damages calculations. Consequently, the issue of damages was never tried and no damages were awarded. Plaintiffs cross-appeal from the District Court’s order granting Eaton’s motion to exclude and the District Court’s subsequent denial of Plaintiffs’ motion for clarification. For the reasons set forth below, we will affirm the District Court’s orders to the extent that they excluded Plaintiffs’ expert’s testimony based on the damages calculations in his initial expert report, but reverse to the extent that the District Court denied Plaintiffs’ request to amend the report to submit alternate damages calculations. Finally, although the District Court awarded no damages, it did enter injunctive relief against Eaton. On appeal, Eaton argues that Plaintiffs lack standing to seek injunctive relief because they are no longer in the heavy-duty truck transmissions market, and have expressed no concrete desire to re-enter the market. We agree and will vacate the District Court’s order issuing injunctive relief.
I. BACKGROUND
A. Factual Background

1. Market Background

The parties agree that the relevant market in this case is heavy-duty “Class 8” truck transmissions (“HD transmissions”) in North America. Heavy-duty trucks include 18-wheeler “linehaul” trucks, which are used to travel long distances on highways, and “performance” vehicles, such as cement mixers, garbage trucks, and dump trucks. There are three types of [¶] transmissions: three-pedal manual, which uses a clutch to change gears; two-pedal automatic; and two-or-three-pedal automated mechanical, which engages the gears mechanically through electronic controls. Linehaul and performance trans *264 missions, which comprise over 90% of the market, typically use manual or automated mechanical transmissions.[1]
There are only four direct purchasers of [¶] transmissions in North America: Freightliner, LLC (“Freightliner”), International Truck and Engine Corporation (“International”), PACCAR, Inc. (“PAC-CAR”), and Volvo Group (“Volvo”). These companies are referred to as the Original Equipment Manufacturers (“OEMs”). The ultimate consumers of [¶] transmissions, truck buyers, purchase trucks from the OEMs. Truck buyers have the ability to select many of the components used in their trucks, including the transmissions, from OEM catalogues called “data books.” Data books list the alternative component choices, and include a price for each option relative to the “standard” or “preferred” offerings. The “standard” offering is the component that is provided to the customer unless the customer expressly designates another supplier’s product, while the “preferred” or “preferentially-priced” offering is the lowest priced component in data book among comparable products. Data book positioning is a form of advertising, and standard or preferred positioning generally means that customers are more likely to purchase that supplier’s components. Although customers may, and sometimes do, request components that are not published in a data book, doing so is often cumbersome and increases the cost of the component. Thus, data book positioning is essential in the industry.
Eaton has long been a monopolist in the market for [¶] transmissions in North America.[2] It began making [¶] transmissions in the 1950s, and was the only significant manufacturer until Meritor entered the market in 1989 and began offering manual transmissions primarily for line-haul trucks. By 1999, Meritor had obtained approximately 17% of the market for sales of [¶] transmissions, including 30% for linehaul transmissions. In mid-1999, Meritor and ZF Friedrichshafen (“ZF AG”), a leading supplier of [¶] transmissions in Europe, formed the joint venture ZF Meritor, and Meritor transferred its transmissions business into the joint venture.[3] Aside from Meritor, and then ZF Meritor, no significant external supplier of [¶] transmissions has entered the market in the past 20 years.[4]
One purpose of the ZF Meritor joint venture was to adapt ZF AG’s two-pedal automated mechanical transmission, ASTronic, which was used exclusively in Europe, for the North American market. The redesign and testing took 18 months, and ZF Meritor introduced the adapted ASTronic model into the North American market in 2001 under the new name FreedomLine. FreedomLine was the first two-pedal automated mechanical transmission to be sold in North America.[5] When FreedomLine was released, Eaton projected that automated mechanical transmissions would account for 30-50% of the market for all [¶] transmission sales by 2004 or 2005.

*265
2. Eaton’s Long-Term, Agreements

In late 1999 through early 2000, the trucking industry experienced a 40-50% decline in demand for new heavy-duty trucks. Shortly thereafter, Eaton entered into new long-term agreements (“LTAs”) with each OEM. Although long-term supply contracts were not uncommon in the industry, and were also utilized by Meritor in the 1990s, Eaton’s new LTAs were unprecedented in terms of their length and coverage of the market. Eaton signed LTAs with every OEM, and each LTA was for a term of at least five years.
Although the LTAs’ terms varied somewhat, the key provisions were similar. Each LTA included a conditional rebate provision, under which an OEM would only receive rebates if it purchased a specified percentage of its requirements from Eaton.[6] Eaton’s LTA with Freightliner, the largest OEM, provided for rebates if Freightliner purchased 92% or more of its requirements from Eaton.[7] Under Eaton’s LTA with International, Eaton agreed to make an up-front payment of $2.5 million, and any additional rebates were conditioned on International purchasing 87% to 97.5% of its requirements from Eaton. The PACCAR LTA provided for an up-front payment of $1 million, and conditioned rebates on PACCAR meeting a 90% to 95% market-share penetration target. Finally, Eaton’s LTA with Volvo provided for discounts if Volvo reached a market-share penetration level of 70% to 78%.[8] The LTAs were not true requirements contracts because they did not expressly require the OEMs to purchase a specified percentage of their needs from Eaton. However, the Freightliner and Volvo LTAs gave Eaton the right to terminate the agreements if the share penetration goals were not met. Additionally, if an OEM did not meet its market-share penetration target for one year, Eaton could require repayment of all contractual savings.
Each LTA also required the OEM to publish Eaton as the standard offering in its data book, and under two of the four LTAs, the OEM was required to remove competitors’ products from its data book entirely. Freightliner agreed to exclusively publish Eaton transmissions in its data books through 2002, but reserved the right to publish ZF Meritor’s FreedomLine through the life of the agreement. In 2002, Freightliner and Eaton revised the LTA to allow Freightliner to publish other competitors’ transmissions, but the revised LTA provided that Eaton had the right to “renegotiate the rebate schedule” if Freightliner chose to publish a competitor’s transmission. Subsequently, Freightliner agreed to a request by Eaton to remove FreedomLine from all of its data books. Eaton’s LTA with International also required that International list exclusively Eaton transmissions in its elec *266 tronic data book. International did, however, publish ZF Meritor’s manual transmissions in its printed data book. The Volvo and PACCAR LTAs did not require that Eaton products be the exclusive offering, but did require that Eaton products be listed as the preferred offering. Both Volvo and PACCAR continued to list ZF Meritor’s products in their data books. In the 1990s, Meritor’s products were listed in all OEM component data books, and in some cases, had preferred positioning.
The LTAs also required the OEMs to “preferential price” Eaton transmissions against competitors’ equivalent transmissions. Eaton claims that it sought preferential pricing to ensure that its low prices were passed on to truck buyers. However, there were no express requirements in the LTAs that savings be passed on to truck buyers (i.e., that Eaton’s prices be reduced) and there is evidence that the “preferential pricing” was achieved by both lowering the prices of Eaton’s products and raising the prices of competitors’ products. Eaton notes that it was “common” for price savings to be passed down to truck buyers, and a Volvo executive testified that some of the savings from Eaton products were passed down while others were kept to improve profit margins. Plaintiffs, however, emphasize that according to an email sent by Eaton to Freightliner,. the Freightliner LTA required .that ZF Meritor’s products be priced at a $200 premium over equivalent Eaton products. Likewise, International agreed to an “artificialf ] penal[ty]” of $150 on all of ZF Meritor’s transmissions as of early 2003, and PACCAR imposed a penalty on customers who chose ZF Meritor’s products.
Finally, each LTA contained a “competitiveness” clause, which permitted the OEM to purchase transmissions from another supplier if that supplier offered the OEM a lower price or a better product, the OEM notified Eaton of the competitor’s offer, and Eaton could not match the price or quality of the product after good faith efforts. The parties dispute the significance of the “competitiveness” clauses. Eaton maintains that Plaintiffs were free to win the OEMs’ business simply by offering a better product or a lower price, while Plaintiffs argue and presented testimony from OEM officials that, due to Eaton’s- status as a dominant supplier, the competitiveness clauses were effectively meaningless.

3. Competition under the LTAs and Plaintiffs’ Exit from the Market

After Eaton entered into its LTAs with the OEMs, ZF Meritor shifted its marketing focus from the OEM level to a strategy targeted at truck buyers. Also during this time period, both ZF Meritor and Eaton experienced quality and performance issues with their transmissions. For example, Eaton’s Lightning transmission, which was an initial attempt by Eaton to compete with FreedomLine, was “not perceived as a good [product]” and was ultimately taken off the market. ZF Meritor’s Freedom-Line and “G Platform” transmissions required frequent repairs, and in 2002 and 2003, ZF Meritor faced millions of dollars in warranty claims.
During the life of the LTAs, the OEMs worked with Eaton to develop a strategy to combat ZF Meritor’s growth. On Eaton’s urging, the OEMs imposed additional price penalties on customers that selected ZF Meritor products, “force fed” Eaton products to customers, and sought to persuade truck fleets using ZF Meritor transmissions to shift to Eaton transmissions. At all times relevant to this case, Eaton’s average prices were lower than Plaintiffs’ average prices, and on several occasions, Plaintiffs declined to grant price conces *267 sions requested by OEMs. Although Eaton’s prices were generally lower than Plaintiffs’ prices, Eaton never priced at a level below its costs.
By 2003, ZF Meritor determined that it was limited by the LTAs to no more than 8% of the market, far less than the 30% that it had projected at the beginning of the joint venture. ZF Meritor officials concluded that the company could not remain viable with a market share below 10% and therefore decided to dissolve the joint venture. After ZF Meritor’s departure, Meritor remained a supplier of [¶] transmissions and became a sales agent for ZF AG to ensure continued customer access to the FreedomLine. However, Meritor’s market share dropped to 4% by the end of fiscal year 2005, and Meritor exited the business in January 2007.
B. Procedural History
On October 5, 2006, Plaintiffs filed suit against Eaton in the U.S. District Court for the District of Delaware, alleging that Eaton used unlawful agreements in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; acted unlawfully to maintain a monopoly, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and entered into illegal restrictive dealing agreements, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14. Specifically, Plaintiffs alleged that Eaton “used its dominant position to induce all heavy duty truck manufacturers to enter into de facto exclusive dealing contracts with Eaton,” and that such agreements foreclosed Plaintiffs from over 90% of the market for [¶] transmission sales. Plaintiffs sought treble damages, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.
On February 17, 2009, Plaintiffs’ expert, Dr. David DeRamus (“DeRamus”), submitted a report on both liability and damages. On May 11, 2009, Eaton filed a motion, pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to exclude DeRamus’s testimony. The District Court ruled that DeRamus would be allowed to testify regarding liability, but excluded DeRamus’s testimony on the issue of damages on the basis that his damages opinion failed the reliability requirements of Daubert and the Federal Rules of Evidence. ZF Meritor LLC v. Eaton Corp., 646 F.Supp.2d 663 (D.Del.2009). Plaintiffs filed- a motion for clarification, requesting that DeRamus be allowed to testify to alternate damages calculations -based on other data in his expert report, or in the alternative, seeking permission for DeRamus to amend his expert report to present his alternate damages calculations. The District Court decided to defer resolution of the damages issue and bifurcate the case.
The parties proceeded to trial on liability. On October 8, 2009, after a four-week trial, the jury returned a complete verdict for Plaintiffs, finding that Eaton had violated Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act. Following the verdict, Plaintiffs asked the District Court to set a damages trial, but no damages trial was set at that time. On October 30, 2009, Plaintiffs supplemented their earlier motion for clarification, incorporating additional arguments based on developments at trial.
On November 3, 2009, Eaton filed a renewed motion for judgment as a matter of law, or in the alternative, for a new trial. Eaton’s principal argument was that Plaintiffs failed to establish that Eaton engaged in anticompetitive conduct because Plaintiffs did not show, nor did they attempt to *268 show, that Eaton priced its transmissions below its costs. Sixteen months later, on March 10, 2011, the District Court denied Eaton’s motion, reasoning that Eaton’s prices were not dispositive, and that there was sufficient evidence for a jury to conclude that Eaton’s conduct unlawfully foreclosed competition in a substantial portion of the [¶] transmissions market. ZF Mentor LLC v. Eaton Corp., 769 F.Supp.2d 684 (D.Del.2011).
On August 4, 2011, the District Court denied Plaintiffs’ motion for clarification, and denied Plaintiffs’ request to allow DeRamus to amend his expert report to include alternate damages calculations. The same day, the District Court entered an order awarding Plaintiffs $0 in damages. On August 19, 2011, the District Court entered an injunction prohibiting Eaton from “linking discounts and other benefits to market penetration targets,” but stayed the injunction pending appeal. Eaton filed a timely notice of appeal and Plaintiffs filed a timely cross-appeal.
II. JURISDICTION AND STANDARD OF REVIEW
The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1337. We have appellate jurisdiction under 28 U.S.C. § 1291.
We exercise plenary review over an order denying a motion for judgment as a matter of law. LePage’s Inc. v. 3M, 324 F.3d 141, 145 (3d Cir.2003) (en banc). A motion for judgment as a matter of law should be granted “only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.” Id. at 145-46 (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993)). We review questions of law underlying a jury verdict under a plenary standard of review. Id. at 146 (citing Bloom v. Consol. Rail Corp., 41 F.3d 911, 913 (3d Cir.1994)). Underlying legal questions aside, “[a] jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict.” Swineford v. Snyder Cnty., 15 F.3d 1258, 1265 (3d Cir.1994).
We review a district court’s decision to exclude expert testimony for abuse of discretion. Montgomery Cnty. v. Microvote Corp., 320 F.3d 440, 445 (3d Cir.2003). To the extent the district court’s decision involved an interpretation of the Federal Rules of Evidence, our review is plenary. Elcock v. Kmart Corp., 233 F.3d 734, 745 (3d Cir.2000). We also review a district court’s decisions regarding discovery and case management for abuse of discretion. United States v. Schiff, 602 F.3d 152, 176 (3d Cir.2010); In re Fine Paper Antitrust Litig., 685 F.2d 810, 817-18 (3d Cir.1982).
We review legal conclusions regarding standing de novo, and the underlying factual determinations for clear error. Interfaith Cmty. Org. v. Honeywell Int’l, Inc., 399 F.3d 248, 253 (3d Cir.2005).
III. DISCUSSION
A. Effect of the Price-Cost Test
The most significant issue in this case is whether Plaintiffs’ allegations under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act are subject to the price-cost test or the “rule of reason” applicable to exclusive dealing claims. Under the rule of reason, an exclusive dealing arrangement will be unlawful only if its “probable effect” is to substantially lessen competition in the relevant market. Tampa Elec. Co. v. Nash *269 ville Coal Co., 365 U.S. 320, 327-29, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); United States v. Dentsply Int'l, 399 F.3d 181, 191 (3d Cir.2005); Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir.1992). In contrast, under the price-cost test, to succeed on a challenge to the defendant’s pricing practices, a plaintiff must prove “that the [defendant’s] prices are below an appropriate measure of [the defendant’s] costs.” Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).[9]
Eaton urges us to apply the price-cost test, arguing that Plaintiffs failed to establish that Eaton engaged in anticompetitive conduct or that Plaintiffs suffered an antitrust injury because Plaintiffs did not prove — or even attempt to prove — that Eaton priced its transmissions below an appropriate measure of its costs. We decline to adopt Eaton’s unduly narrow characterization of this case as a “pricing practices” case, i.e., a case in which price is the clearly predominant mechanism of exclusion. Plaintiffs consistently argued that the LTAs, in their entirety, constituted de facto exclusive dealing contracts, which improperly foreclosed a substantial share of the market, and thereby harmed competition. Accordingly, as we will discuss below, we must evaluate the legality of Eaton’s conduct under the rule of reason to determine whether the “probable effect” of such conduct was to substantially lessen competition in the [¶] transmissions market in North America. Tampa Elec., 365 U.S. at 327-29, 81 S.Ct. 623. The price-cost test is not dispositive. •

*270
1. Law of Exclusive Dealing

An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time. Herbert Hovenkamp, Antitrust Law ¶ 1800a, at 3 (3d ed. 2011). The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition. Dentsply, 399 F.3d at 191. Generally, a prerequisite to any exclusive dealing claim is an agreement to deal exclusively. Tampa Elec., 365 U.S. at 326-27, 81 S.Ct. 623; see Dentsply, 399 F.3d at 193-94; Barr Labs., 978 F.2d at 110 & n. 24.[10] An express exclusivity requirement, however, is not necessary, LePage’s, 324 F.3d at 157, because we look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement “in the real world.” Dentsply, 399 F.3d at 191, 194. Thus, de facto exclusive dealing claims are cognizable under the antitrust laws. LePage’s, 324 F.3d at 157.
Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition. Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 76 (3d Cir.2010) (“[I]t is widely recognized that in many circumstances, [exclusive dealing arrangements] may be highly efficient — to assure supply, price stability, outlets, investment, best efforts or the like — and pose no competitive threat at all.”) (quoting E. Food Servs. v. Pontifical Catholic Univ. Servs. Ass’n, 357 F.3d 1, 8 (1st Cir.2004)). For example, “[i]n the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand.” Standard Oil Co. v. United States, 337 U.S. 293, 306, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). From the seller’s perspective, an exclusive dealing arrangement with customers may reduce expenses, provide protection against price fluctuations, and offer the possibility of a predictable market. Id. at 306-07, 69 S.Ct. 1051; see also Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1234 n. 17 (8th Cir.1987) (explaining that exclusive dealing contracts can help prevent dealer free-riding on manufacturer-supplied investments to promote rival’s products). As such, competition to be an exclusive supplier may constitute “a vital form of rivalry,” which the antitrust laws should encourage. Race Tires, 614 F.3d at 83 (quoting Menasha Corp. v. News Am. Mktg. In-Store, Inc., 354 F.3d 661, 663 (7th Cir.2004)).
However, “[exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods[.]” Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (O’Connor, J., concurring), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006); Barry Wright, 724 F.2d at 236 (explaining that “under certain circumstances[,] foreclosure might discourage sellers from entering, or seeking to sell in, a market at all, thereby reducing the amount of competition that *271 would otherwise be available”). Exclusive dealing arrangements are of special concern when imposed by a monopolist. See Dentsply, 399 F.3d at 187 (“Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist”). For example:
[S]uppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival. A set of strategically planned exclusive-dealing contracts may slow the rival’s expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival’s growth.
Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1802c, at 64 (2d ed. 2002). In some cases, a dominant firm may be able to foreclose rival suppliers from a large enough portion of the market to deprive such rivals of the opportunity to achieve the minimum economies of scale necessary to compete. Id.; see LePage’s, 324 F.3d at 159.
Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason. Tampa Elec., 365 U.S. at 327, 81 S.Ct. 623. The legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition. Id. at 328, 81 S.Ct. 623; Barr Labs., 978 F.2d at 110. In conducting this analysis, courts consider not only the percentage of the market foreclosed, but also take into account “the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market.” Barr Labs., 978 F.2d at 110-11 (quoting Am. Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1251-52 n. 75 (3d Cir.1975)). As the Supreme Court has explained:
[I]t is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.
Tampa Elec., 365 U.S. at 329, 81 S.Ct. 623. In other words, an exclusive dealing arrangement is unlawful only if the “probable effect” of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals. Id.; Dentsply, 399 F.3d at 191 (“The test [for determining anticompetitive effect] is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market’s ambit.”).
There is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant market power by the defendant, Tampa Elec., 365 U.S. at 329, 81 S.Ct. 623; Race Tires, 614 F.3d at 74-75; LePage’s, 324 F.3d at 158, substantial foreclosure, Tampa Elec., 365 U.S. at 327-28, 81 S.Ct. 623; United States v. Microsoft Corp., 253 F.3d 34, 69 (D.C.Cir.2001), contracts of sufficient duration to prevent meaningful competition by rivals, CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 81 (2d Cir.1999); Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir.1997), and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects, Race Tires, 614 F.3d at 75; Dents- *272 ply, 399 F.3d at 194; Barr Labs., 978 F.2d at 111. Courts will also consider whether there is evidence that the dominant firm engaged in coercive behavior, Race Tires, 614 F.3d at 77; SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1062 (3d Cir.1978), and the ability of customers to terminate the agreements, Dentsply, 399 F.3d at 193-94. The use of exclusive dealing by competitors of the defendant is also sometimes considered. Standard Oil, 337 U.S. at 309, 314, 69 S.Ct. 1051; NicSand, Inc. v. 3M Co., 507 F.3d 442, 454 (6th Cir.2007).
2. Brooke Group and the Price-Cost test
We turn now to some fundamental principles regarding predatory pricing claims and the price-cost test. “Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run.” Cargill, Inc. v. Monfort of Colo., 479 U.S. 104, 117, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 n. 8, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Advo, Inc. v. Phila. Newspapers, Inc., 51 F.3d 1191, 1198 (3d Cir.1995). The Supreme Court has expressed deep skepticism of predatory pricing claims. See Cargill, 479 U.S. at 121 n. 17, 107 S.Ct. 484 (“Although the commentators disagree as to whether it is ever rational for a firm to engage in such conduct, it is plain that the obstacles to the successful execution of a strategy of predation are manifold, and that the disincentives to engage in such a strategy are accordingly numerous.”) (citations omitted); Matsushita, 475 U.S. at 589, 106 S.Ct. 1348 (“[P]redatory pricing schemes are rarely tried, and even more rarely successful.”) (citations omitted). In the typical predatory pricing scheme, a firm reduces the sale price of its product to below-cost, intending to drive eompeti- ■ tors out of the business. Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 318, 127 S.Ct. 1069, 166 L.Ed.2d 911 (2007). Then, once competitors have been eliminated, the firm raises its prices to supracompetitive levels. Id. For such a scheme to make economic sense, the firm must recoup the losses suffered during the below-cost phase in the supracompetitive phase. Id.; see Matsushita, 475 U.S. at 589, 106 S.Ct. 1348 (explaining that success under such a scheme is “inherently uncertain” because the firm must sustain definite short-term losses, but the long-run gain depends on successfully eliminating competition).
In Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. at 222-24, 113 S.Ct. 2578, the Supreme Court fashioned a two-part test that reflected this “economic reality.” Weyerhaeuser, 549 U.S. at 318, 127 S.Ct. 1069. The Court held that, to succeed on a predatory pricing claim, the plaintiff must prove: (1) “that the prices complained of are below an appropriate measure of [the defendant’s] costs”; and (2) that the defendant had “a dangerous probability ... of recouping its investment in below-cost prices.” Brooke Grp., 509 U.S. at 222-24, 113 S.Ct. 2578 (citations omitted). We are concerned only with the first requirement, which has become known as the price-cost test. In adopting the price-cost test, the Court rejected the notion that above-cost prices that are below general market levels or below the costs of a firm’s competitors are actionable under the antitrust laws. Id. at 223, 113 S.Ct. 2578. “Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels [i.e., above-cost], they do not threaten competition.” Id. (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340, 110 S.Ct. *273 1884, 109 L.Ed.2d 338 (1990)). Low, but above-cost, prices are generally procompetitive because “the exclusionary effect of prices above a relevant measure of cost [generally] reflects the lower cost structure of the alleged predator, and so represents competition on the merits[.]” Id.; see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (“The antitrust laws ... were enacted for ‘the protection of competition, not competitors.’ ”) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). The Court acknowledged that there may be situations in which above-cost prices are anticompetitive, but stated that it “is beyond the practical ability of a judicial tribunal” to ascertain whether above-cost pricing is anticompetitive “without courting intolerable risks of chilling legitimate price-cutting.” Brooke Grp., 509 U.S. at 223, 113 S.Ct. 2578 (citing Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶¶ 714.2, 714.3 (Supp. 2002)). “To hold that the antitrust laws protect competitors from the loss of profits due to [above-cost] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result.” Id. (quoting Cargill, 479 U.S. at 116, 107 S.Ct. 484). Significantly, because “[c]utting prices in order to increase business often is the very essence of competition ..., [i]n cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are ‘especially costly, because they chill the very conduct that antitrust laws are designed to protect.’ ” Pac. Bell Tel. Co. v. Linkline Commc’ns, Inc., 555 U.S. 438, 451, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009) (quoting Matsushita, 475 U.S. at 594, 106 S.Ct. 1348) (additional citations omitted).

3. Effect of the Price-Cost Test on Plaintiffs’ Exclusive Dealing Claims

Eaton argues that principles from the predatory pricing case law apply in this case because Plaintiffs’, claims are, at their core, no more than objections to Eaton offering prices, through its rebate program, which Plaintiffs were unable to match. Eaton contends that Plaintiffs have identified nothing, other than Eaton’s pricing practices, that ineentivized the OEMs to enter into the LTAs, and because price was the incentive, we must apply the price-cost test. We acknowledge that even if a plaintiff frames its claim as one of exclusive dealing, the price-cost test may be dispositive. Implicit in the Supreme Court’s creation of the price-cost test was a balancing of the procompetitive justifications of above-cost pricing against its anti-competitive effects (as well as the anticompetitive effects of allowing judicial inquiry into above-cost pricing), and a conclusion that the balance always tips in favor of allowing above-cost pricing practices to stand. See Linkline, 555 U.S. at 451, 129 S.Ct. 1109; Brooke Grp., 509 U.S. at 223, 113 S.Ct. 2578. Thus, in the context of exclusive dealing, the price-cost test may be utilized as a specific application of the “rule of reason” when the plaintiff alleges that price is the vehicle of exclusion. See, e.g., Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060-63 (8th Cir.2000).
Here, Eaton argues that the price-cost test is dispositive, and therefore that Plaintiffs’ claims must fail because Plaintiffs failed to show that the market-share rebates offered by Eaton pursuant to the LTAs resulted in below-cost prices. We do not disagree that predatory pricing principles, including the price-cost test, would control if this case presented solely *274 a challenge to Eaton’s pricing practices.[11] The lesson of the predatory pricing case *275 law is that, generally, above-cost prices are not anticompetitive, and although there may be rare cases where above-cost prices are anticompetitive in the long run, it is “beyond the practical ability” of courts to identify those rare cases without creating an impermissibly high risk of deterring legitimate procompetitive behavior (i.e., price-cutting). Linkline, 555 U.S. at 452, 129 S.Ct. 1109; Weyerhaeuser, 549 U.S. at 318-19, 127 S.Ct. 1069; Brooke Grp., 509 U.S. at 223, 113 S.Ct. 2578. These principles extend to above-cost discounting or rebate programs, which condition the discounts or rebates on the customer’s purchasing of a specified volume or a specified percentage of its requirements from the seller. See NicSand, 507 F.3d at 451-52 (applying price-cost test to a challenge to up-front payments offered by a supplier to several large retailers on the basis that such payments were “nothing more than ‘price reductions offered to the buyers for the exclusive right to supply a set of stores under multi-year contracts’ ”); Concord Boat, 207 F.3d at 1060-63 (applying price-cost test to volume discounts and market-share discounts offered by a manufacturer); Barry Wright, 724 F.2d at 232 (applying the price-cost test to uphold discounts linked to a requirements contract); see also Race Tires, 614 F.3d at 79 (“[I]t is no more an act of coercion, collusion, or [other anticompetitive conduct] for [a supplier] ... to offer more money to [a customer] than it is for such [a] supplierf] to offer the lowest ... prices.”).
Moreover, a plaintiff’s characterization of its claim as an exclusive dealing claim does not take the price-cost test off the table. Indeed, contracts in which discounts are linked to purchase (volume or market share) targets are frequently challenged as de facto exclusive dealing arrangements on the grounds that the discounts induce customers to deal exclusively with the firm offering the rebates. Hovenkamp ¶ 1807a, at 132. However, when price is the clearly predominant mechanism of exclusion, the price-cost test tells us that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects. See Brooke Grp., 509 U.S. at 223, 113 S.Ct. 2578; Concord Boat, 207 F.3d at 1062 (noting that there is always a legitimate business justification for lowering prices: attempting to attract additional business).
In each of the cases relied upon by Eaton, the Supreme Court applied the price-cost test, regardless of the way in which the plaintiff cast its grievance, because pricing itself operated as the exclusionary tool. For example, in Cargill, Inc. v. Monfort of Colorado, Inc., the plaintiff argued that a proposed merger between vertically integrated firms violated Section 7 of the Clayton Act because the result of the merger would have been to substantially lessen competition or create a monopoly. 479 U.S. at 114, 107 S.Ct. 484. The plaintiff offered, as a theory of antitrust injury, that it faced a threat of lost profits stemming from the possibility that the defendant, after the merger, would lower its prices to a level at or above-cost. Id. at 114-15, 107 S.Ct. 484. The plaintiff claimed that it would have to respond by lowering its prices, which would cause it to suffer a loss in profitability. Id. at 115, 107 S.Ct. 484. The Supreme Court held that such a theory did not present a cognizable antitrust injury, reasoning that “the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued [above-cost] competition.” Id. at 116, 107 S.Ct. 484.
*276 Atlantic Richfield Co. v. USA Petroleum Co. involved an allegation that a vertical price-fixing agreement was unlawful under Section 1 of the Sherman Act. 495 U.S. at 331, 110 S.Ct. 1884. In that case, the plaintiff was an independent retail marketer of gasoline, which bought gasoline from major petroleum companies for resale under its own name. Id. The defendant was an integrated oil company, which sold directly to consumers through its own stations, and sold indirectly through brand dealers. Id. Facing competition from independent marketers like the plaintiff, the defendant adopted a new marketing strategy, under which it encouraged its dealers to match the retail prices offered by independents by offering discounts and reducing the dealers’ costs. Id. at 331-32, 110 S.Ct. 1884. The plaintiff brought suit under the Sherman Act, alleging that the defendant conspired with its dealers to sell gasoline at below-market levels. Id. at 332, 110 S.Ct. 1884. The district court granted summary judgment for the defendant on the basis that the plaintiff had not shown that the defendant engaged in predatory pricing, and thus had not shown any antitrust injury. Id. at 333, 110 S.Ct. 1884. The U.S. Court of Appeals for the Ninth Circuit reversed, USA Petroleum Co. v. Atl. Richfield Co., 859 F.2d 687, 693 (9th Cir.1988), reasoning that a showing of predatory pricing was not necessary to establish antitrust injury; rather, the antitrust laws were designed to ensure that market forces alone determine what goods and services are offered, and at what price they are sold, and thus, an antitrust injury could result from a disruption in the market. The Supreme Court disagreed, explaining that where a firm (or a group of firms) lowers prices pursuant to a vertical agreement, but maintains those prices above predatory levels, any business lost by rivals cannot be viewed as an anticompetitive consequence of the agreement. Atl. Richfield, 495 U.S. at 337, 110 S.Ct. 1884. “A firm complaining about the harm it suffers from nonpredatory price competition is really claiming that it is unable to raise prices.” Id. at 337-38, 110 S.Ct. 1884.
In Brooke Group, the plaintiff and the defendant were competitors in the cigarette market in the early 1980s. 509 U.S. at 212, 113 S.Ct. 2578. At that time, demand for cigarettes in the United States was declining .and the plaintiff, once a major force in the industry, had seen its market share drop to 2%. Id. at 214, 113 S.Ct. 2578. In response, the plaintiff developed a line of generic cigarettes, which were significantly cheaper than branded cigarettes. Id. The plaintiff promoted the generic cigarettes at the wholesale level by offering rebates that increased with the volume of cigarettes ordered. Id. Losing volume and profits on its branded products, the defendant entered the generic cigarette market. Id. at 215, 113 S.Ct. 2578. At the retail level, the suggested price of the defendant’s generic cigarettes was the same as that of the plaintiffs cigarettes, but the defendant’s volume discounts to wholesalers were larger. Id. The plaintiff responded by increasing its wholesale rebates, and a' price war ensued. Id. at 216, 113 S.Ct. 2578. Subsequently, the plaintiff filed a complaint against the defendant under the Robinson-Patman Act, 15 U.S.C. § 13(a), alleging that the defendant’s volume rebates amounted to unlawful price discrimination. Id. The plaintiff explained that it would have been unable to reduce its wholesale rebates without losing substantial market share. Id. Accordingly, because the “essence” of the plaintiffs claim was that its “rival ha[d] priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant mar *277 ket,” the plaintiff had an obligation to show that the defendant’s prices were below its costs. Id. at 222, 113 S.Ct. 2578.
Here, in contrast to Cargill, Atlantic Richfield, and Brooke Group, Plaintiffs did not rely solely on the exclusionary effect of Eaton’s prices, and instead highlighted a number of anticompetitive provisions in the LTAs. Plaintiffs alleged that Eaton used its position as a supplier of necessary products to persuade OEMs to enter into agreements imposing de facto purchase requirements of roughly 90% for at least five years, and that Eaton worked in concert with the OEMs to block customer access to Plaintiffs’ products, thereby ensuring that Plaintiffs would be unable to build enough market share to pose any threat to Eaton’s monopoly. Therefore, because price itself was not the clearly predominant mechanism of exclusion, the price-cost test cases are inapposite, and the rule of reason is the proper framework within which to evaluate Plaintiffs’ claims.
We recognize that Eaton’s rebates were part of Plaintiffs’ case. DeRamus testified about the exclusionary effect of the rebates, OEM officials testified that Eaton offered lower prices, and Plaintiffs’ counsel stated in oral argument that part of the reason ZF Meritor could not increase sales above a certain level was that “the OEMs were trying to hit those [share-penetration] targets to get their money from Eaton.” Eaton’s post-rebate prices were attractive to the OEMs, and Eaton’s low prices may, in fact, have been an inducement for the OEMs to enter into the LTAs. That fact is not irrelevant, as it may help explain why the OEMs agreed to otherwise unfavorable terms and it may help to rebut an argument that the agreements were inefficient. Hovenkamp ¶ 1807b, at 134. However, contrary to Eaton’s assertions, that fact is not dispositive.
Plaintiffs presented considerable evidence that Eaton was a monopolist in the industry and that it wielded its monopoly power to effectively force every direct purchaser of [¶] transmissions to enter into restrictive long-term agreements, despite the inclusion in such agreements of terms unfavorable to the OEMs and their customers. Significantly, there was considerable testimony that the OEMs did not want to remove ZF Meritor’s transmissions from their data books, but that they were essentially forced to do so or risk financial penalties or supply shortages. Several OEM officials testified that exclusive data book listing was not a common practice in the industry and, in fact, it was probably detrimental to customers. An email between Freightliner employees stated: “From a customer perspective, publishing [ZF Meritor’s] product is probably the right thing to do and [it] should never have been taken out of the book. It is a good product with considerable demand in the marketplace.” The email went on to conclude, however, that including ZF Meritor’s products would not be “prudent” because it would jeopardize Freightliner’s relationship with Eaton. Eaton itself even acknowledged that the OEMs were dissatisfied. Internal Eaton correspondence reveals that PACCAR complained that the LTAs were preventing it from promoting a competitive product (FreedomLine), which was being demanded by truck buyers. In fact, PACCAR felt that Eaton was holding it “hostage.”
Plaintiffs also introduced evidence that not only were the rebates conditioned on the OEMs meeting the market penetration targets, but so too was Eaton’s continued compliance with the agreements. As one OEM executive testified, if the market penetration targets were not met, the OEMs “would have a big risk of cancellation of the contract, price increases, and shortages if the market [was] difficult.” *278 Eaton was a monopolist in the [¶] transmissions market, and even if an OEM decided to forgo the rebates and purchase a significant portion of its requirements from another supplier, there would still have been a significant demand from truck buyers for Eaton products. Therefore, losing Eaton as a supplier was not an option.
Accordingly, this is not a case in which the defendant’s low price was the clear driving force behind the customer’s compliance with purchase targets, and the customers were free to walk away if a competitor offered a better price. Compare Concord Boat, 207 F.3d at 1063 (in deciding to apply price-cost test, noting that customers were free to walk away at any time and did so when the defendant’s competitors offered better discounts), with Dentsply, 399 F.3d at 189-96 (applying exclusive dealing analysis where the defendant threatened to refuse to continue dealing with customers if customers purchased rival’s products, and no customer could stay in business without the defendant’s products). Rather, Plaintiffs introduced evidence that compliance with the market penetration targets was mandatory because failing to meet such targets would jeopardize the OEMs’ relationships with the dominant manufacturer of transmissions in the market. See Dentsply, 399 F.3d at 194 (noting that “[t]he paltry penetration in the market by competitors over the years has been a refutation of’ the theory that a competitor could steal the defendant’s customers by offering a better deal or a lower price “by tangible and measurable results in the real world”); id. at 195 (explaining that an exclusivity policy imposed by a dominant firm is especially troubling where it presents customers with an “all-or-nothing” choice).
Although the Supreme Court has created a safe harbor for above-cost discounting, it has not established a per se rule of non-liability under the antitrust laws for all contractual practices that involve above-cost pricing. See Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 901 (9th Cir.2008) (stating that the Supreme Court’s predatory pricing decisions have not “go[ne] so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct[,] the plaintiff must prove that those prices were below cost”). Nothing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful. We decline to impose such an unduly simplistic and mechanical rule because to do so would place a significant portion of anti-competitive conduct outside the reach of the antitrust laws without adequate justification.
“[T]he means of illicit exclusion, like the means of legitimate competition, are myriad.” Microsoft, 253 F.3d at 58; LePage’s, 324 F.3d at 152 (“ ‘Anticompetitive conduct’ can come in too many different forms, and is too dependent on context, for any court or commentator ever to have enumerated all the varieties.”) (quoting Caribbean Broadcasting Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1087 (D.C.Cir.1998)). The law has long recognized forms of exclusionary conduct that do not involve below-cost pricing, including unlawful tying, Jefferson Parish, 466 U.S. at 21, 104 S.Ct. 1551; Standard Oil, 337 U.S. at 305-06, 69 S.Ct. 1051, enforcement of a legal monopoly provided by a patent procured through fraud, LePage’s, 324 F.3d at 152 (citing Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965)), refusal to deal, Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601-02, 105 S.Ct. 2847, 86 L.Ed.2d 467 *279 (1985); Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), exclusive dealing, Tampa Electric, 365 U.S. at 327, 81 S.Ct. 623; Dentsply, 399 F.3d at 184, and other unfair tortious conduct targeting competitors, Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768 (6th Cir.2002); Int'l Travel Arrangers, Inc. v. Western Airlines, Inc., 623 F.2d 1255 (8th Cir.1980).
Despite Eaton’s arguments to the contrary, we find nothing in the Supreme Court’s recent predatory pricing decisions to indicate that the Court intended to overturn decades of other precedent holding that conduct that does not result in below-cost pricing may nevertheless be anticompetitive. Rather, as we explained above, Brooke Group and the cases preceding it each involved an allegation that the defendant’s pricing itself operated as the exclusionary tool. See Brooke Grp., 509 U.S. at 212-22, 113 S.Ct. 2578; Atl. Richfield, 495 U.S. at 331-38, 110 S.Ct. 1884; Cargill, 479 U.S. at 114-16, 107 S.Ct. 484. Eaton places particular emphasis on two recent cases, arguing that such cases demonstrate the Supreme Court’s willingness to extend the price-cost test beyond the traditional predatory pricing context. However, neither of these cases suggests that the price-cost test applies to the exclusive dealing claims at issue in our case.
In Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. at 315, 320, 127 S.Ct. 1069, the Supreme Court applied the price-cost test to a case involving an allegation of predatory bidding by a monopsonist.[12] In a predatory bidding scheme, a purchaser of inputs bids up the market price of a critical input to such high levels that rival buyers cannot survive, and as a result acquires or maintains monopsony power. Id. Then, “if all goes as planned,” once rivals have been driven out, the predatory bidder will reap monopsonistic profits to offset the losses that it suffered during the high-bidding stage. Id. at 321, 127 S.Ct. 1069. Therefore, the Court explained, predatory pricing and predatory bidding claims are “analytically similar.” Id. “Both claims involve the deliberate use of unilateral pricing measures for anticompetitive purposes.” Id. at 322, 127 S.Ct. 1069. Moreover, the Court noted, bidding up input prices, like lowering costs, is often “the very essence of competition.” Id. at 323, 127 S.Ct. 1069 (citing Brooke Grp., 509 U.S. at 226, 113 S.Ct. 2578). “Just as sellers use output prices to compete for purchasers, buyers use bid prices to compete for scarce inputs. There are myriad legitimate reasons — ranging from benign to affirmatively procompetitive — why a buyer might bid up input prices.” Id. Furthermore, high bidding •will often benefit consumers because it will likely lead to the firm’s acquisition of more inputs, which will generally lead to the manufacture of more outputs, and an increase in outputs generally results in lower prices for consumers. Id. at 324, 127 S.Ct. 1069. Accordingly, the Supreme Court adopted a variation of the price-cost test for allegations of predatory bidding: “[a] plaintiff must prove that the alleged predatory bidding led to below-cost pricing of the predator’s outputs.” Id. at 325, 127 S.Ct. 1069. In other words, the firm’s predatory bidding must have caused the cost of the relevant output to increase above the revenues generated by the sale of such output. Id.
*280 In Pacific Bell Telephone Co. v. Linkline Communications, Inc., the Supreme Court relied, in part, on the price-cost test to hold that the plaintiffs’ price-squeezing claim was not cognizable under the Sherman Act. 555 U.S. at 457, 129 S.Ct. 1109. In that case, the plaintiffs alleged that the defendant, an integrated firm that sold inputs at wholesale and sold finished goods at retail, drove its competitors out of the market by raising the wholesale price while simultaneously lowering the retail price. Id. at 442, 129 S.Ct. 1109. The Court held that, pursuant to Verizon Communications Inc. v. Trinko, LLP, 540 U.S. at 409-10, 124 S.Ct. 872, the wholesale claim was not cognizable because the defendant had no antitrust duty to deal with its competitors at the wholesale level, and pursuant to Brooke Group, the retail claim was not cognizable because the defendant’s retail prices were above cost. Linkline, 555 U.S. at 457, 129 S.Ct. 1109. As to the retail claim, the Court explained that “recognizing a price-squeeze claim where the defendant’s retail price remains above cost would invite the precise harm” the price-cost test was designed to avoid: a firm might refrain from aggressive price competition to avoid potential antitrust liability. Id. at 451-52, 129 S.Ct. 1109. Recognizing that the plaintiffs were trying to combine two non-cognizable claims into a new form of antitrust liability, the Court explained that “[t]wo wrong claims do not make one that is right.” Id. at 457, 129 S.Ct. 1109.
Contrary to Eaton’s argument, neither Weyerhaeuser nor Linkline stands for the proposition that the price-cost test applies here. Weyerhaeuser established the straightforward principle that the exercise of market power on prices for the purpose of driving out competitors should be judged by the same standard, whether such power is exercised on the input or output side of the market. See 549 U.S. at 321, 325, 127 S.Ct. 1069. And Linkline did no more than hold that two antitrust theories cannot be combined to form a new theory of antitrust liability. See 555 U.S. at 457, 129 S.Ct. 1109. The plaintiffs’ retail-level claim in Linkline was a traditional pricing practices claim, and therefore indistinguishable from the pricing practices claims in Brooke Group, Atlantic Richfield, and Cargill. 555 U.S. at 451-52, 457, 129 S.Ct. 1109.[13]
*281 In contrast to the price-cost test line of cases, here, Plaintiffs do not allege that price itself functioned as the exclusionary tool. As such, we conclude that the price-cost test is not adequate to judge the legality of Eaton’s conduct. Although prices are unlikely to exclude equally efficient rivals unless they are below-cost, exclusive dealing arrangements can exclude equally efficient (or potentially equally efficient) rivals, and thereby harm competition, irrespective of below-cost pricing. See Dentsply, 399 F.3d at 191. Where, as here, a dominant supplier enters into de facto exclusive dealing arrangements with every customer in the market, other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand. See id. at 191, 194. Therefore, Eaton’s attempt to characterize this case as a pricing practices case, subject to the price-cost test, is unavailing. We hold that, instead, the rule of reason from Tampa Electric and its progeny must be applied to evaluate Plaintiffs’ claims.
B. Proof of Anticompetitive Conduct and Antitrust Injury
We turn now to Eaton’s contention that even leaving aside the price-cost test, Plaintiffs failed to prove that Eaton’s LTAs were anticompetitive or that they caused antitrust injury to Plaintiffs. The rule of reason governs Plaintiffs’ claims under Section 1 and Section 2 of the Sherman Act, and Section 3 of the Clayton Act. See LePage’s, 324 F.3d at 157 & n. 10 (explaining that exclusive dealing claims are cognizable under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, and evaluated under the same rule of reason); see also Section III.A, supra, at n. 9. Under the rule of reason, an exclusive dealing arrangement is anticompetitive only if its “probable effect” is to substantially lessen competition in the relevant market, rather than merely disadvantage rivals. Tampa Elec., 365 U.S. at 328-29, 81 S.Ct. 623.
In addition to establishing a statutory violation, a plaintiff must demonstrate that it suffered antitrust injury. Race Tires, 614 F.3d at 75. To establish antitrust injury, the plaintiff must demonstrate: “(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant’s acts unlawful.” Id. at 76 (quoting Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir.1993)) (additional citation omitted).
Our inquiry on appeal has several components. First, we examine whether the LTAs could reasonably be viewed as exclusive dealing arrangements, despite the fact that the LTAs covered less than 100% of the OEMs’ purchase requirements and contained no express exclusivity provisions. Second, because the unique characteristics of the [¶] transmissions market bear heavily on our inquiry, we review Eaton’s monopoly power, the concentrated *282 nature of the market, and the ability of a monopolist in Eaton’s position to engage in coercive conduct. Third, we discuss the anticompetitive effects of the various provisions in the LTAs, and consider Eaton’s procompetitive justifications for the agreements. Finally, we consider whether Plaintiffs established that they suffered antitrust injury as a result of Eaton’s conduct.
1. De Facto Partial Exclusive Dealing
A threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing. Eaton argues that Plaintiffs’ claims must fail because the LTAs were not “true” exclusive dealing arrangements in that they did not contain express exclusivity requirements, nor did they cover 100% of the OEMs’ purchases. Neither contention is persuasive because de facto partial exclusive dealing arrangements may, under certain circumstances, be actionable under the antitrust laws.[14]
First, the law is clear that an express exclusivity requirement is not necessary because de facto exclusive dealing may be unlawful. Tampa Elec., 365 U.S. at 326, 81 S.Ct. 623; Dentsply, 399 F.3d at 193; LePage’s, 324 F.3d at 157. For example, in United States v. Dentsply International, Inc., we held that transactions which were “technically only a series of independent sales” could form the basis for an exclusive dealing claim because the large share of the market held by the defendant and its conduct in excluding competitors, “realistically made the arrangements ... as effective as those in written contracts.” 399 F.3d at 193 (citing Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 n. 9, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). Likewise, in LePage’s, we held that bundled rebates and discounts offered to major suppliers were designed to and did operate as exclusive dealing arrangements, despite the lack of any express exclusivity requirements. 324 F.3d at 157-58.
Here, there was sufficient evidence from which a jury could infer that, although the LTAs did not expressly require the OEMs to meet the market penetration targets, the targets were as effective as mandatory purchase requirements. See Tampa Elec., 365 U.S. at 326, 81 S.Ct. 623 (noting that “even though a contract does ‘not contain specific agreements not to use the (goods) of a competitor,’ if ‘the practical effect is to prevent such use,’ it comes within the condition of [Section 3] as to exclusivity”) (citing United Shoe Mach. Corp. v. United States, 258 U.S. 451, 457, 42 S.Ct. 363, 66 L.Ed. 708 (1922)); Dentsply, 399 F.3d at 193-94. Evidence presented at trial indicated that not only were lower prices (rebates) conditioned on the OEMs meeting the market-share targets, but so too was Eaton’s continued compliance with the LTAs. For example, Eaton’s LTAs with Freightliner, the largest OEM, and Volvo explicitly gave Eaton the right to terminate the agreements if the market-share targets were not met. And despite the fact that Eaton did not actually termi *283 nate the agreements on the rare occasion when an OEM failed to meet its target, the OEMs believed that it might.[15] Critically, due to Eaton’s position as the dominant supplier, no OEM could satisfy customer demand without at least some Eaton products, and therefore no OEM could afford to lose Eaton as a supplier. Accordingly, we agree with the District Court that a jury could have concluded that, under the circumstances, the market penetration targets were as effective as express purchase requirements “because no risk averse business would jeopardize its relationship with the largest manufacturer of transmissions in the market.” ZF Mentor, 769 F.Supp.2d at 692.
Second, an agreement does not need to be 100% exclusive in order to meet the legal requirements of exclusive dealing. We acknowledge that “partial” exclusive dealing is rarely a valid antitrust theory. See Barr Labs., 978 F.2d at 110 n. 24 (“An agreement affecting less than all purchases does not amount to true exclusive dealing.”) (citation omitted); Concord Boat, 207 F.3d at 1044, 1062-63 (noting that the defendant’s discount program, which conditioned incremental discounts on customers purchasing 60-80% of their needs from the defendant, did not constitute exclusive dealing because customers were not required to purchase all of their requirements from the defendant, and in fact, could purchase up to 40% of their requirements from other sellers without foregoing the discounts); Magnus Petroleum Co. v. Skelly Oil Co., 599 F.2d 196, 200-01 (7th Cir.1979) (holding that contract requiring buyer to purchase a fixed quantity of goods that amounted to roughly 60-80% of its needs was not unlawful “[b]ecause the agreements contained no exclusive dealing clause and did not require [the buyer] to purchase any amounts of [the defendant’s product] that even approached [its] requirements”) (citations omitted). Partial exclusive dealing agreements such as partial requirements contracts and contracts stipulating a fixed dollar or quantity amount are generally lawful because market foreclosure is only partial, and competing sellers are not prevented from selling to the buyer. See Concord Boat, 207 F.3d at 1062-63; Magnus Petroleum, 599 F.2d at 200-01.
However, we decline to adopt Eaton’s view that a requirements contract covering less than 100% of the buyer’s needs can never be an unlawful exclusive dealing arrangement. See Eastman Kodak, 504 U.S. at 466-67, 112 S.Ct. 2072 (“Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.”). “Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue.” Verizon Commc’ns, 540 U.S. at 411, 124 S.Ct. 872. Therefore, just as “total foreclosure” is not required for an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each customer. See Dentsply, 399 F.3d at 191. The legality of such an arrangement ultimately depends on whether the agreement foreclosed a substantial share of the relevant market such that competition was harmed. Tampa Elec., 365 U.S. at 326-28, 81 S.Ct. 623.
In our case, although the market-share targets covered less than 100% of the OEMs’ needs, a jury could nevertheless find that the LTAs unlawfully foreclosed competition in a substantial share of the HD transmissions market. See id. There are only four direct purchasers of *284 [¶] transmissions in North America, and Eaton, long the dominant supplier in the industry, entered into long-term agreements with each of them. Compare Concord Boat, 207 F.3d at 1044 (noting the defendant was the market leader, but there were at least ten other competing manufacturers). Each LTA imposed a market-penetration target of roughly 90% (with the exception of Volvo, which manufactured some of its own transmissions for use in its own trucks), which we explained above, could be viewed as a requirement that the OEM purchase that percentage of its requirements from Eaton. Although no agreement was completely exclusive, the foreclosure that resulted was no different than it would be in a market with many customers where a dominant supplier enters into complete exclusive dealing arrangements with 90% of the customer base. Under such circumstances, the lack of complete exclusivity in each contract does not preclude Plaintiffs’ de facto exclusive dealing claim.[16]

2. Market Conditions in [¶] Transmissions Market

Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present. See Tampa Elec., 365 U.S. at 329, 81 S.Ct. 623; Race Tires, 614 F.3d at 77-78; LePage’s, 324 F.3d at 159. For example, if the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals. Tampa Elec., 365 U.S. at 329, 81 S.Ct. 623; Dentsply, 399 F.3d at 187. Here, the jury found that Eaton possessed monopoly power in the [¶] transmissions market, and Eaton does not contest that finding on appeal.
A hard look at the nature of the market in which the parties compete is equally important. Tampa Elec., 365 U.S. at 329, 81 S.Ct. 623. An exclusive dealing arrangement is most likely to present a threat to competition in a situation in which the market is highly concentrated, such that long-term contracts operate to “foreclose so large a percentage of the available supply or outlets that entry” or continued operation in “the concentrated market is unreasonably constricted.” Race Tires, 614 F.3d at 76 (quoting E. Food Servs., 357 F.3d at 8); see Dentsply, 399 F.3d at 184 (noting that the relevant market was “marked by a low or no-growth potential” and the defendant had long dominated the industry with a 75-80% market share). Here, the [¶] transmissions market had long been dominated by Eaton. Except for Meritor’s production of manual transmissions in the 1990s and the ZF Meritor joint venture, no significant external supplier has entered the market for the last twenty years. A jury could certainly infer that Eaton’s dominance over the OEMs created a barrier to entry that any potential rival manufacturer would have to confront. See Concord Boat, 207 F.3d at 1059 (“If entry barriers to new firms are not significant, it may be difficult for even a monopoly company to control prices through some type of exclusive dealing arrangement because a new firm or firms easily can enter the market to challenge it [but] [i]f there are significant entry barriers ..., a potential competitor would have difficulty entering.”) *285 (citations omitted). The record shows that the barriers to entry in the North American [¶] transmission market are especially high: [¶] transmissions are expensive to produce; transmissions developed for other geographic markets must be substantially modified for the- North American market; and all [¶] transmission sales must pass through the highly concentrated intermediate market in which the OEMs operate. Eaton’s theory that ZF Meritor or any new [¶] transmissions manufacturer would be able to “steal” an Eaton customer by offering a superior product at a lower price “simply has not proved to be realistic.” Dentsply, 399 F.3d at 194 (citation omitted); compare NicSand, 507 F.3d at 454 (in finding exclusive dealing arrangements lawful, noting that the plaintiff was the market leader, and lost business due to a new entrant’s competition). “The paltry penetration in the market by competitors over the years has been a refutation of [Eaton’s] theory by tangible and measurable results in the real world.” Dentsply, 399 F.3d at 194; see Microsoft, 253 F.3d at 55 (noting importance of significant barriers to entry in maintaining monopoly power, in spite of the plaintiffs’ self-imposed problems).
Although we generally “assume that a customer will make [its] decision only on the merits,” Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 133 (3d Cir.2005) (quoting Steams Airport Equip. Co. v. FMG Corp., 170 F.3d 518, 524-25 (5th Cir.1999)), a monopolist may use its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice. See Race Tires, 614 F.3d at 77 (noting that coercion “has played a key, if sometimes unexplored, role” in antitrust law); Dentsply, 399 F.3d at 184 (observing that the defendant “imposed” an exclusivity policy on its customers); LePage’s, 324 F.3d at 159 (explaining that because 3M occupied a dominant position in several different product[1] markets, it was able to effectively force customers in the “private label” tape market to deal with 3M exclusively, despite the plaintiffs competitiveness in that market). A highly concentrated market, in which there is one (or a few) dominant supplier(s), creates the possibility for such coercion. And here, there was evidence that Eaton leveraged its position as a supplier of necessary products to coerce the OEMs into entering into the LTAs. Plaintiffs presented testimony from OEM officials that many of the terms of the LTAs were unfavorable to the OEMs and their customers, but that the OEMs agreed to such terms because without Eaton’s transmissions, the OEMs would be unable to satisfy customer demand.[17]
Accordingly, this case involves precisely the combination of factors that we explained would be present in the rare case in which exclusive dealing would pose a threat-to competition. See Race Tires, 614 F.3d at 76.

*286
3. Sufficiency of the Evidence: Anticompetitive Conduct

We turn now to a discussion of whether there was sufficient evidence for a jury to conclude that Eaton engaged in anticompetitive conduct. Our inquiry in a sufficiency of the evidence challenge is limited to determining whether, “viewing the evidence in the light most favorable to the [winner at trial] and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.” Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993) (citation omitted). Eaton argues that even under the extraordinarily deferential standard, there was insufficient evidence for a reasonable jury to conclude that Eaton engaged in conduct that harmed competition. Guided by the principles set forth in Section III.A.1, supra, we disagree.
i. Extent of Foreclosure
First, the extent of the market foreclosure in this case was significant. “The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, ‘the opportunities for other[s] ... to enter into or remain in that market must be significantly limited.’ ” Microsoft, 253 F.3d at 69 (citing Tampa Elec., 365 U.S. at 328, 81 S.Ct. 623). Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching “the critical level necessary” to pose a real threat to the defendant’s business., Dentsply, 399 F.3d at 191. Here, Eaton entered into long-term agreements with every direct purchaser in the market, and under each agreement, imposed what could be viewed as mandatory purchase requirements of at least 80%, and up to 97.5%. The OEMs generally met these targets, which, as Plaintiffs’ expert testified, resulted in approximately 15% of the market remaining open to Eaton’s competitors by 2003.[18] See LePage’s, 324 F.3d at 159 (noting that foreclosure of 40% to 50% is usually required to establish an exclusive dealing violation under Section 1 of the Sherman Act (citing Microsoft, 253 F.3d at 70)). From 2000 through 2003, Plaintiffs’ overall market share ranged from 8-14%, and by 2005, Plaintiffs’ market share had dropped to 4%.
ii. Duration of LTAs
Second, the LTAs were not short-term agreements, which would present little threat, to competition. See, e.g., Christofferson Dairy, Inc. v. MMM Sales, Inc., 849 F.2d 1168, 1173 (9th Cir.1988) (upholding exclusive dealing arrangement of “short duration”); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 395 (7th Cir.1984) (noting that exclusive dealing contracts of less than one year are presumptively lawful); Barry Wright, 724 F.2d at 237 (citing two-year term in upholding requirements contract). Rather, each LTA was for a term of at least five years, and the PACCAR LTA was for a *287 seven-year term.[19] See FTC v. Motion Picture Adver. Serv. Co., 344 U.S. 392, 393-96, 73 S.Ct. 361, 97 L.Ed. 426 (1953) (upholding contracts of one year or less, but condemning contract terms ranging from two to five years). Although long exclusive dealing contracts are not per se unlawful, “[t]he significance of any particular contract duration is a function of both the number of such contracts and market share covered by the exclusive-dealing contracts.” Hovenkamp ¶ 1802g, at 98. Here, Eaton entered into long-term contracts with every direct purchaser in the market, which locked up over 85% of the market for at least five years. Although long-term agreements had previously been used in the [¶] transmissions industry, it was unprecedented for a supplier to enter into contracts of such duration with the entire customer base.
Eaton acknowledges, as it must, the unprecedented length of the LTAs, but maintains that the LTAs were not anticompetitive because they were easily terminable. See, e.g., PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 111 (2d Cir.2002) (finding challenged contracts lawful, in part, because they were terminable at will); Omega Envtl., 127 F.3d at 1164 (noting easy terminability of agreements). Each LTA included a “competitiveness” clause, which permitted the OEM to purchase from another supplier or terminate the agreement if another supplier offered a better product or a lower price. However, Plaintiffs presented evidence that any language giving OEMs the right to terminate the agreements was essentially meaningless because Eaton had assured that there would be no other supplier that could fulfill the OEMs’ needs or offer a lower price. Thus, a jury could very well conclude that “in spite of the legal ease with which the relationship c[ould] be terminated,” the OEMs had a strong economic incentive to adhere to the terms of the LTAs, and therefore were not free to walk away from the agreements and purchase products from the supplier of their choice. Dentsply, 399 F.3d at 194.
iii. Additional Anticompetitive Provisions in LTAs
Third, the LTAs were replete with provisions that a reasonable jury could find anticompetitive. To begin, a jury could have found that the data book provisions were anticompetitive in that they limited the ability of ZF Meritor to effectively market its products, and limited the ability of truck buyers to choose from a full menu of available transmissions. See id. (discussing anticompetitive effect of limitations on customer choice). Eaton downplays the significance of the data book provisions, arguing that truck buyers always remained free to request unlisted transmissions, and ZF Meritor remained free to market directly to truck buyers. However, the mere existence of potential alternative avenues of distribution, without “an assessment of their overall significance to the market,” is insufficient to demonstrate that Plaintiffs’ opportunities to compete were not foreclosed. Id. at 196. An OEM’s data book was the “most important tool” that any buyer selecting component parts for a truck would use. If a product was not listed in a data book, it was “a disaster for the supplier.” Although truck buyers could request unpublished components, doing so involved additional transaction costs, and in practice, meant that truck buyers were far more likely to select a product listed in the data book. See id. at 193 (explaining that the key question was not whether alternative distribution methods allowed a competitor to “survive” but whether the alternative methods would *288 “pose[] a real threat” to the defendant’s monopoly) (citing Microsoft, 253 F.3d at 71). Additionally, prior to the LTAs, it was not common practice for one supplier to be given exclusive data book listing. Historically, data books had included all product offerings, including Meritor transmissions, and the OEMs acknowledged that removing ZF Meritor products, especially FreedomLine, from the data books was “from a customer perspective,” the wrong thing to do so because they were “good produces] with considerable demand in the marketplace.”
A jury could also have found that the “preferential pricing” provisions in the LTAs were anticompetitive. Although it was “common” for price savings to be passed down to truck buyers in the form of lower prices, and there are indications that at least some of the savings from Eaton transmissions were indeed passed down, there is also evidence' that the preferential prices were achieved by artificially increasing the prices of Plaintiffs’ products.
Additionally, the jury could have determined that the “competitiveness” clauses were of little practical import because Eaton’s conduct ensured that no rival would be able to offer a comparable deal. There was also evidence that the competitiveness clauses were met with stiff resistance by Eaton.
iv. Anticompetitive Effects vs. Procompetitive Effects
Finally, the only procompetitive justification offered by Eaton on appeal is that the LTAs were crafted to meet customer demand to reduce prices, as well as engineering and support costs. See Barr Labs., 978 F.2d at 111 (explaining that courts must “evaluate the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market”) (citations omitted). In response to the economic downturn in the heavy-duty trucking industry in the late 1990s and early 2000s, each OEM sought to negotiate lower prices, and some sought to reduce the number of suppliers. During this time, oversupply was a problem, as were low truck prices, and an unavailability of drivers. It appears that Eaton responded well to the downturn; despite persistent quality control problems and a relatively late introduction of two-pedal automated mechanical transmissions, the company cut costs and increased market share.
However, no OEM ever asked Eaton to be a sole supplier, and there was considerable testimony from OEM officials that it was in an OEM’s interest to have multiple suppliers. Although long-term agreements offering market-share or volume discounts had been used in the industry in the past (for transmissions and for other truck components), OEM executives consistently testified that Eaton’s new LTAs represented a substantial departure from past practice. For example, the longest supply agreements Freightliner and Volvo had ever signed previously were for two-year terms. Likewise, OEM officials testified that the provisions in the LTAs requiring exclusive data book listing and “preferential pricing” were not common. Critically, there was considerable evidence from which a jury could infer that the primary purpose of the LTAs was not to meet customer demand, but to take preemptive steps to block potential competition from the new ZF Meritor joint venture. Eaton devised the unprecedented LTAs only after Meritor formed the joint venture with ZF AG, which Eaton viewed as a “serious competitor.” Eaton feared that the ZF Meritor joint venture would put Eaton’s “[North American] position at risk” by introducing a new product (FreedomLine) for which there was significant *289 customer demand, but for which Eaton did not produce a comparable alternative.
In sum, the LTAs included numerous provisions raising anticompetitive concerns and there was evidence that Eaton sought to aggressively enforce the agreements, even when OEMs voiced objections.[20] Accordingly, we hold that there was more than sufficient evidence for a jury to conclude that the cumulative effect of Eaton’s conduct was to adversely affect competition.[21]

4. Sufficiency of the Evidence: Antitrust Injury

Having concluded that there was sufficient evidence from which a jury could determine that the LTAs functioned as unlawful exclusive dealing agreements, we have no difficulty concluding that there was likewise sufficient evidence that Plaintiffs suffered antitrust injury. See Atl. Richfield, 495 U.S. at 344, 110 S.Ct. 1884 (explaining that a plaintiff suffers antitrust injury if its injury “stems from a competition-reducing aspect or effect of the defendant’s behavior”). Eaton’s conduct unlawfully foreclosed a substantial share of the [¶] transmissions market, which would otherwise have been available for rivals, including Plaintiffs. ZF Meritor exited the market in 2003, followed by Meritor in 2006, because they could not maintain high enough market shares to remain viable. A jury could certainly conclude that Plaintiffs’ inability to grow was a direct result of Eaton’s exclusionary conduct.
C. Expert Testimony

1. Expert Testimony on Liability

Eaton raises two challenges to the District Court’s decision to admit DeRamus’s testimony on liability. First, Eaton argues that DeRamus failed to employ any recognized or reliable economic test for determining whether Eaton’s conduct harmed competition and caused antitrust injury. Second, Eaton contends that DeRamus’s opinion was contradicted by the facts. We disagree with both contentions.[22]
Federal Rule of Evidence 702 provides: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the ex *290 pert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.
Under Rule 702, the district court acts as a “gatekeeper” to ensure that “the expert’s opinion [is] based on the methods and procedures of science rather than on subjective belief or unsupported speculation.” Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir.2003) (quoting In re Paoli R.R. Yard PCB Litig. (Paoli II), 35 F.3d 717, 741 (3d Cir.1994)). Here, as the District Court noted, DeRamus relied on the exclusionary nature of the LTAs to form his opinion. He defined the relevant market, determined whether Eaton has monopoly power, and engaged in an analysis of Eaton’s conduct, taking into account market conditions and the extent of the exclusive dealing. He examined the effect of the LTAs on prices and consumer choice, and considered whether foreclosure of the market could be attributed to factors other than the LTAs, such as market conditions or quality issues with Plaintiffs’ products. We find no error in the District Court’s acceptance of DeRamus’s methodologies as reliable under Rule 702. See LePage’s, 324 F.3d at 154-64 (analyzing exclusive dealing by looking to many of the same factors considered by DeRamus).
Eaton also argues that DeRamus’s opinion was contradicted by the facts. “When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury’s verdict.” Brooke Grp., 509 U.S. at 242, 113 S.Ct. 2578; Phila. Newspapers, 51 F.3d at 1198. In an antitrust case, an expert opinion generally must “incorporate all aspects of the economic reality” of the relevant market. Concord Boat, 207 F.3d at 1057. Here, the District Court properly rejected Eaton’s argument that DeRamus’s testimony should have been excluded on the basis that it was contradicted by other facts. Eaton’s argument on this point really amounts to nothing more than a complaint that DeRamus did not adopt Eaton’s view of the case. The District Court correctly noted that, although some of DeRamus’s testimony may have been contradicted by other evidence, including the testimony of Eaton’s expert, the existence of conflicting evidence was not a basis on which to exclude DeRamus’s testimony. The respective credibility of Plaintiffs’ and Eaton’s experts was a question for the jury to decide. LePage’s, 324 F.3d at 165. DeRamus was extensively cross-examined and Eaton presented testimony from its own expert, who opined that the LTAs had no anticompetitive effect. In the end, the jury apparently found DeRamus to be more credible. “[Eatonj’s disappointment as to the jury’s finding of credibility does not constitute an abuse of discretion by the District Court in allowing [DeRamus’s] testimony.” Id. at 166.

2. Expert Testimony on Damages

In their cross-appeal, Plaintiffs argue that the District Court erred in excluding DeRamus’s testimony on the issue of damages. The core of DeRamus’s damages analysis was one page (titled “Five Year Product Line Profit and Loss”) of ZF Meritor’s Revised Strategic Business Plan (“SBP”) for fiscal years 2002 through 2005, which was presented to ZF Meritor’s *291 Board of Directors in November 2000.[23] The District Court determined that, although DeRamus used methodologies regularly employed by economists, his opinion nevertheless failed the reliability requirements of Dauberb and the Federal Rules of Evidence because the underlying data was not sufficiently reliable. The District Court acknowledged that experts often rely on business plans in forming damages estimates, but concluded that DeRamus’s reliance on the SBP in this case was improper because he did not know either the qualifications of the individuals who prepared the SBP estimates or the assumptions upon which the estimates were based. Plaintiffs filed a motion for clarification, which asked the District Court to allow DeRamus to testify based on his existing expert report to damages estimates independent of the SBP, or, in the alternative, to allow him to amend his report to include the alternate damages estimates. The District Court did not resolve the damages issue at that time, and bifurcated the case. After the trial on liability, Plaintiffs supplemented their pre-trial motion for clarification, adding several new arguments based on developments at trial, and renewing their request that DeRamus be allowed to testify based on alternate calculations. The District Court denied Plaintiffs’ motion and awarded $0 in damages.
Our inquiry on appeal is two-fold. Initially, we must determine whether the District Court erred in excluding the expert opinion of DeRamus on the basis that it was not sufficiently reliable. Then, we must consider whether the District Court abused its discretion in denying Plaintiffs’ request to allow DeRamus to testify to alternative damages calculations. We will address these issues in turn.
i. DeRamus’s original damages calculations
First, we will consider Plaintiffs’ contention that the District Court erred in determining that DeRamus’s damages opinion was not sufficiently reliable. Federal Rule of Evidence 702, as amended in 2000 to incorporate the standards set forth in Dauberb, imposes an obligation upon a district court to ensure that expert testimony is not only relevant, but reliable. Fed.R.Evid. 702; Paoli II, 35 F.3d at 744. As we have made clear, “the reliability analysis [required by Dauberb ] applies to all aspects of an expert’s testimony: the methodology, the facts underlying the expert’s opinion, [and] the link between the facts and the conclusion.” Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir.1999); see also id. (“Not only must each stage of the expert’s testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.”). As we explain below, the District Court did not abuse its discretion by finding that DeRamus’s damages estimate, which was based heavily on the SBP projections, bore insufficient indicia of reliability to be submitted to a jury.
To determine the damages suffered by Plaintiffs as a result of Eaton’s anticompetitive conduct, DeRamus conducted a two-part analysis. He computed Plaintiffs’ lost profits for the period between 2000 and 2009, as well as the lost enterprise value of Plaintiffs’ [¶] transmissions business. To calculate Plaintiffs’ lost profits, DeRamus first estimated the incremental revenues that Plaintiffs would have earned “but for” Eaton’s anticompetitive conduct, and then subtracted from that figure the incremental cost that Plaintiffs would have *292 had to incur to achieve such incremental sales.
Ordinarily, such an approach would be appropriate because “an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened ‘but for’ the defendant’s unlawful activities.” LePage’s, 324 F.3d at 165 (citations omitted). However, the District Court’s primary criticism of DeRamus’s report was that he did not construct an offense-free world based on actual financial data, but instead relied on a one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based. In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable. See Fed.R.Evid. 702; Daubert, 509 U.S. at 592-95, 113 S.Ct. 2786; Paoli II, 35 F.3d at 748 n. 18 (“Arguably, [third-party estimates] that an expert relies on are not his underlying data, but rather the data that went into the [third-party estimates] in the first place are his underlying data.”).
Plaintiffs contend that DeRamus’s reliance on the SBP estimates was appropriate because a company’s internal financial projections, like those in the SBP, are regularly and reasonably relied upon by economists in formulating opinions regarding a company’s performance in an offense-free world. Plaintiffs are certainly correct that “internal projections for future growth” often serve as legitimate bases for expert opinions. See LePage’s, 324 F.3d at 165; Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 566 (2d Cir.1970) (holding that damages testimony was admissible because the financial projections on which the testimony was based “were the product of deliberation by experienced businessmen charting their future course”). Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections. As such, experts frequently use a plaintiffs business plan to estimate the plaintiffs expected profits in the absence of the defendant’s misconduct. See Litigation Services Handbook: The Role of the Financial Expert 24:13 (4th ed. 2007). However, there is no per se rule of inclusion where an expert relies on a business plan; district courts must perform a case-by-case inquiry to determine whether the expert’s reliance on the business plan in a given case is reasonable. See Heller, 167 F.3d at 155.
Here, the District Court concluded that the SBP could not serve as a reliable basis for DeRamus’s opinion because he was unaware of the qualifications of the individuals who prepared the document, or the assumptions on which the estimates were based. Plaintiffs argue that these factual findings are contradicted by the record. Admittedly, the record indicates that DeRamus did not, as the District Court suggested, blindly accept the SBP estimates without question. DeRamus was aware that the SBP had been presented to ZF Meritor’s Board of Directors, and that it was revised several times to “address and resolve queries management had about the reasonableness of the assumptions, projections, [and] forecasts.” He also knew that the Board had relied on the SBP in making business decisions. Moreover, ZF Meritor’s former president testified that he “did not submit SBPs to' management for review unless [he] believed the projections, forecasts, and assumptions therein to be reliable.”
*293 However, contrary to Plaintiffs’ assertions, these excerpts from the record do not contradict the District Court’s ultimate findings. The record amply supports the District Court’s concern that, although DeRamus was generally aware of the circumstances under which the SBP was created and the purposes for which it was used, he lacked critical information that would be necessary for Eaton to effectively cross-examine him. An expert’s “lack of familiarity with the methods and the reasons underlying [someone else’s] projections virtually preclude[s] any assessment of the validity of the projections through cross-examination.” TK-7 Corp. v. Estate of Barbouti 993 F.2d 722, 732 (10th Cir.1993); compare Autowest, 434 F.2d at 566 (holding that projections of company officials were admissible where such officials “set out at length the bases from which they derived their figures, and consequently, [the opposing party] was able to cross-examine them vigorously”). Here, DeRamus knew that the SBP was presented to the Board by experienced management professionals, but he did not know who initially calculated the SBP figures. He did not know whether the SBP projections were calculated by ZF Meritor management, lower level employees at ZF Meritor, or came from some outside source. Nor did DeRamus know the methodology used to create the SBP or the assumptions on which the SBP’s price and volume estimates were based.[24]
Under the deferential abuse of discretion standard, we will not disturb a district court’s decision to exclude testimony unless we are left with “a definite and firm conviction that the court below committed a clear error of judgment.” In re TMI Litig., 193 F.3d 613, 666 (3d Cir.1999) (citation omitted). Plaintiffs cannot clear that high hurdle. Accordingly, we conclude that the District Court acted within its discretion in determining that one page of financial projections for a nascent company, the assumptions underlying which were relatively unknown, did not provide “good grounds,” Paoli II, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590, 113 S.Ct. 2786), for DeRamus to generate his damages estimate. Compare LePage’s, 324 F.3d at 165 (noting that plaintiffs expert considered the defendant’s internal projections for growth, but also closely examined the market conditions, including the past performance of competitors).
Plaintiffs raise two additional challenges to the District Court’s exclusion of DeRamus’s testimony. First, Plaintiffs contend that because the SBP was admitted into evidence at trial, Rule 703 does not provide a basis for exclusion. However, this argument is based on the flawed assumption that the District Court excluded DeRamus’s testimony under Rule 703, rather than Rule 702. Plaintiffs assume that because the District Court stated that “DeRamus manipulated the SBP using methodologies employed by economists,” ZF Meritor, 646 F.Supp.2d at 667, the District Court necessarily concluded that Rule 702, which focuses on methodologies, was satisfied. However, the District Court explicitly stated that “the fundamental query” was “whether the [SBP] estimates pass[ed] the reliability requirements of Rules 104, 702, and 703.” Id. Although it is not entirely clear from the District Court’s opinion which rule the District Court relied upon in finding DeRamus’s *294 testimony inadmissible, we may affirm evidentiary rulings on any ground supported by the record, Hughes v. Long, 242 F.3d 121, 122 n. 1 (3d Cir.2001), and we conclude that DeRamus’s opinion was properly excluded because it failed the reliability requirements of Rule 702.[25]
Plaintiffs’ suggestion that the reasonableness of an expert’s reliance on facts or data to form his opinion is somehow an inappropriate inquiry under Rule 702 results from an unduly myopic interpretation of Rule 702 and ignores the mandate of Daubert that the district court must act as a gatekeeper. See Daubert, 509 U.S. at 589, 113 S.Ct. 2786; Heller, 167 F.3d at 153 (“While ‘the focus, of course, must be solely on principles and methodology, not on the conclusions that they generate,’ a district court must examine the expert’s conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.”) (emphasis added) (quoting Daubert, 509 U.S. at 595, 113 S.Ct. 2786). Where proffered expert testimony’s “factual basis, data, principles, methods, or their application are called sufficiently into question, ... the trial judge must determine whether the testimony has ‘a reliable basis in the knowledge and experience of the relevant discipline.’ ” Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting Daubert, 509 U.S. at 592, 113 S.Ct. 2786). A district court’s inquiry under Rule 702 is “a flexible one” and must be guided by the facts of the case. Daubert, 509 U.S. at 591, 594, 113 S.Ct. 2786. Here, the District Court’s analysis fell squarely within its flexible gatekeeping function under Daubert and Rule 702. See Kumho Tire Co., 526 U.S. at 149, 119 S.Ct. 1167; Paoli II, 35 F.3d at 748 n. 18; see also Elcock, 233 F.3d at 754 (explaining that an expert’s testimony regarding damages must be based on a sufficient factual foundation); Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 142 (4th Cir.1994) (“An expert’s opinion should be excluded when it is based on assumptions which are speculative and not supported by the record.”).
Second, Plaintiffs argue that the District Court did not provide fair notice that it intended to exclude DeRamus’s testimony under Federal Rule of Evidence 703. Again, this argument rests on the flawed assumption that the District Court relied solely on Rule 703. However, even assuming the District Court mistakenly believed that its Rule 702 reliability analysis actually fell under Rule 703, Plaintiffs’ notice argument would still be meritless. A district court must give the parties “an adequate opportunity to be heard on evidentiary issues.” In re Paoli R.R. Yard PCB Litig. (Paoli I), 916 F.2d 829, 854 (3d Cir.1990). Here, there was extensive briefing regarding DeRamus’s damages opinion, much of which focused on Eaton’s argument that DeRamus’s reliance on the SBP was improper. The District Court held not one, but two in limine hearings, in which DeRamus testified for several *295 hours. ' Compare id. at 854-55 (holding that the ■ district court did not give the plaintiffs an adequate opportunity to be heard where it failed to conduct an in limine hearing and denied oral argument on the evidentiary issues). As such, Plaintiffs were well aware of, and had ample opportunity to be heard on, the question of whether DeRamus’s reliance on the SBP rendered his testimony inadmissible.
ii. Alternate damages calculations
The District Court’s opinion excluding DeRamus’s damages testimony focused exclusively on DeRamus’s damages estimates based on the SBP projections regarding ZF Meritor’s market share and profit margin. However, his expert report also set forth market-share estimates based on an econometric model. The econometric model did not consider the SBP, but instead used economic variables, such as the number of heavy-duty trucks built and sold in the North American market, an index of consumer confidence in the United States, the average wholesale price of oil in the United States, and interest rates. The model also considered ZF Meritor’s market share from the previous month “in order to capture market dynamics.”
To reach his ultimate damages estimate, DeRamus averaged several damages calculations, each of which used a different combination of inputs for market share and profit margin. Following the District Court’s order excluding DeRamus’s testimony due to his reliance on the SBP, Plaintiffs filed a motion for clarification, asking the District Court to allow DeRamus to calculate damages using the same methodologies from his expert report, but using data independent of the SBP. Specifically, Plaintiffs proposed several revisions to DeRamus’s damages estimate. First, Plaintiffs indicated that DeRamus could revise his “Eaton Operating Profit Method,” which used as principal inputs the SBP estimates for market share and Eaton’s actual operating profits for profit margin. Plaintiffs stated that DeRamus had recalculated lost profits using the same methodology, but replacing the market-share data from the SBP with market-share data from his econometric model. Second, Plaintiffs explained that DeRamus could similarly revise his “Econometric Method” of calculating lost profits, which used the econometric model for market share, and data from the SBP for profit margin. He could use the same methodology and replace the profit margin data from the SBP with profit margin data from Plaintiffs’ actual sales data from 1996 through 2000.[26]
Noting that all of the data necessary for DeRamus’s recalculations were already in the expert report, Plaintiffs requested that DeRamus be able to testify to the alternate calculations using the existing expert report. Allowing DeRamus to testify to alternate damages numbers without amending his expert report would have left Eaton without advance notice of the new calculations, and thus would have been improper. As such, the District Court did not err in ruling that DeRamus could not testify to new calculations based on the existing expert report. However, the District Court’s refusal to allow DeRamus to amend his expert report presents a much more difficult question, one that we will explore in depth.
Before beginning our analysis, it is necessary to provide some context regarding the procedural history because the way in *296 which the damages issue was handled by the District Court is significant to our determination that the District Court abused its discretion. After the District Court granted Eaton’s motion to exclude DeRamus’s damages testimony, it granted leave for Plaintiffs to file a motion for clarification to identify damages calculations in DeRamus’s expert report that were not based on the SBP. On September 9, 2009, ten days before trial was set to begin, Plaintiffs filed the motion, acknowledging that new calculations would be required, but submitting that all of the necessary data was already in the report. The next day, the District Court held a pretrial conference, in which it considered Plaintiffs’ motion, and determined that it had. two options: to “basically punt” on the damages issue and bifurcate the case, or to allow Plaintiffs’ new damages theory to go forward and allow Eaton to depose DeRamus to examine his new theories. The District Court concluded that the “cleanest” option was to defer the damages issue, bifurcate, and proceed to trial on liability. That way, the District Court stated, the damages issue would only need to be resolved if “the jury c[ame] back with a plaintiffs’ verdict, which [was] [up]held on appeal.” In opting to defer a decision on damages, the District Court noted that it “did not ... at the moment, have the time to parse [DeRamus’s report] as carefully” as would be necessary to satisfactorily address the parties’ arguments regarding damages.
The jury delivered its verdict on liability on October 8, 2009, and the District Court entered judgment in favor of Plaintiffs on October 14. Two days later, Plaintiffs requested that the District Court set a trial on damages. Eaton opposed Plaintiffs’ request, asserting that the judgment on liability was a final appealable decision. Although the District Court apparently agreed with Eaton initially, stating that it “d[id] not intend to address damages until liability has been finally resolved by the Third Circuit,” the District Court subsequently issued an amended judgment, which stated that because damages had not been resolved, there was no final appealable order under Federal Rule of Civil Procedure 54(b). On November 3, 2009, Eaton filed its renewed motion for judgment, as a matter of law or a new trial. The District Court did not rule on the motion until March 2011.[27]
Following the District Court’s denial of Eaton’s motion, Plaintiffs renewed their request for a damages trial. On July 25, 2011, the District Court held a status conference, in which it heard arguments on whether the liability issue was appealable as a judgment on fewer than all claims under Rule 54(b). Although the District Court initially indicated that it would proceed under Rule 54(b), and once again defer resolution of the damages issue, after both parties agreed that the judgment on liability was not appealable under Rule 54(b) (and that it was unlikely that this Court would grant an interlocutory appeal), the District Court acknowledged that it would “need to go back to the papers and see how I extract myself from the procedural morass that I put myself in.” The District Court then signaled the way in which it would extract itself, stating “so let’s assume that I am going to resurrect a motion that is two years old [Plaintiffs’ September 3, 2009 motion for clarification], and let’s assume that I deny it, and we’re left with the situation we have now. At that point, would it make sense to have *297 a cross-appeal on liability, on the Daubert decision, and get it up to the Third Circuit?”
Several days later, on August 4, 2011, the District Court issued a memorandum opinion and order denying Plaintiffs’ motion for clarification, and awarding $0 in damages. The District Court’s entire analysis of Plaintiffs’ request to modify DeRamus’s report consisted of one paragraph. The District Court concluded that allowing Plaintiffs to amend DeRamus’s expert report “would be tantamount to reopening expert discovery” because DeRamus would need to be deposed again and Eaton would have to prepare another rebuttal expert report. The District Court also noted that, when it granted leave for Plaintiffs to move for clarification, leave was granted only for Plaintiffs to show that DeRamus’s report already contained an alternate damages calculation, and that Plaintiffs’ motion requested permission to submit additional damages calculations. Therefore, the District Court concluded, “[a]t this stage of the litigation,” it would not give Plaintiffs an opportunity to modify their damages estimate.
We provide this extensive review of the procedural history to make a basic point: while we appreciate the District Court’s attempt to conserve judicial resources and refrain from addressing the damages issue unless absolutely necessary, it is apparent from the record that Plaintiffs’ request for permission to submit alternative damages calculations was given little more than nominal consideration. We are mindful that the District Court has considerable discretion in matters regarding expert discovery and case management, and a party challenging the district court’s conduct of discovery procedures bears a “heavy burden.” In re Fine Paper, 685 F.2d at 817-18 (“We will not interfere with a trial court’s control of its docket ‘except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant.’ ”) (citation omitted); see Schiff, 602 F.3d at 176. Under Federal Rule of Civil Procedure 26(a)(2), a party is required to disclose an expert report containing “a complete statement of all opinions the witness will express and the basis and reasons for them.” Fed.R.Civ.P. 26(a)(2)(B)(i) (emphasis added). Any additions or changes to the information in the expert report must be disclosed by the time the party’s pretrial disclosures are due. Fed.R.Civ.P. 26(e)(2). Here, Plaintiffs were required to make all mandatory disclosures six months before trial, including all damages calculations. The damages estimates in DeRamus’s report were found to be unreliable, and Plaintiffs sought, after the date by which discovery disclosures were due, to modify the estimates to reflect reliance on different data. Ordinarily, we will not disrupt a district court’s decision to deny a party’s motion to add information to an expert report under such circumstances. Schiff, 602 F.3d at 176; In re Fine Paper, 685 F.2d at 817. A plaintiff omits evidence necessary to sustain a damages award at its own risk. See Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc., 2 F.3d 493, 504 (3d Cir.1993).
However, exclusion of critical evidence is an “extreme” sanction, and thus, a district court’s discretion is not unlimited. Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir.1997); see also E.E.O.C. v. Gen. Dynamics Corp., 999 F.2d 113, 116 (5th Cir.1993) (explaining that a continuance, as opposed to exclusion, is the “preferred means” of dealing with a party’s attempt to offer new evidence after the time for discovery has closed). There are indeed times, even when control of discovery is at issue, that a *298 district court will “exceed[ ] the permissible bounds of its broad discretion.” Drippe v. Tobelinski 604 F.3d 778, 783 (3d Cir.2010). In Meyers v. Pennypack Woods Home Ownership Ass’n, 559 F.2d 894, 905 (3d Cir.1977), overruled on other grounds by Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir.1985), we set forth five factors that should be considered in deciding whether a district court’s exclusion of evidence as a discovery sanction constitutes an abuse of discretion. Here, although the District Court’s decision was not a discovery sanction nor an exclusion of proffered evidence, but rather an exercise of discretion to control the discovery process and a refusal to allow submission of additional evidence, we find the Penny-pack factors instructive, and thus they will guide our inquiry. See Trilogy Commc’ns, Inc. v. Times Fiber Commc’ns, Inc., 109 F.3d 739, 744-45 (Fed.Cir.1997) (applying factors similar to those set forth in Penny-pack to evaluate whether a district court erred in denying the plaintiffs motion to supplement its expert report with additional data); see also Hunt v. Cnty. of Orange, 672 F.3d 606, 616 (9th Cir.2012) (applying similar factors to determine whether the district court abused its discretion in denying a motion to amend a pretrial order).
In considering whether the District Court abused its discretion in denying Plaintiffs’ request to submit alternate damages calculations, we will consider: (1) “the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified” or the excluded evidence would have been offered; (2) “the ability of that party to cure the prejudice”; (3) the extent to which allowing such witnesses or evidence would “disrupt the orderly and efficient trial of the case or of other eases in the court”; (4) any “bad faith or willfulness in failing to comply with the court’s order”; and (5) the importance of the excluded evidence. Pennypack, 559 F.2d at 904-05. The importance of the evidence is often the most significant factor. See Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 302 (3d Cir.1991); Pennypack, 559 F.2d at 904 (observing “how important [the excluded] testimony might have been and how critical [wa]s its absence”).
Applying the Pennypack factors to this case, we conclude that the District Court abused its discretion in denying Plaintiffs’ request to allow DeRamus to submit his alternate damages estimates. As to the first and second factors, Eaton would not have suffered substantial prejudice if DeRamus were allowed to amend his expert report. DeRamus’s new calculations will be based on data from the initial report, which Eaton has been aware of for nearly three years, and DeRamus will employ methodologies that the District Court has already recognized as being regularly and reliably applied by economists. As Plaintiffs noted in their motion for clarification, it would be “a straightforward matter of arithmetic” to substitute data from the econometric model and actual sales data for the SBP projections. For this reason, the District Court’s concern that granting Plaintiffs’ request would be “tantamount to reopening discovery” seems unfounded. Although Eaton will have to respond to new calculations, it will not have to analyze any new data, or challenge any new methodologies. Moreover, Plaintiffs specifically set forth in their motion for clarification the changes that DeRamus would make, and because the changes only involved the substitution of inputs, Eaton would not be unfairly surprised by the new damages estimates.
As to the third Pennypack factor, allowing DeRamus to submit additional damages calculations will not disrupt the orderly and efficient flow of the case. In *299 fact, our ruling on the liability issues and remand to the District Court to resolve damages is precisely what the District Court and the parties envisioned all along. Eaton, well aware of the District Court’s desire to have this Court determine the liability issues before setting a damages trial, suggested that the best way to accomplish the District Court’s objective was to amend the JMOL order to include “zero damages and no injunctive relief.” As the District Court stated at the July 25, 2011 status conference, “[t]he way I handle complex litigation generally, when I bifurcate, is that I enter a final judgment pursuant to Rule 54(b) ... and once the Circuit Court determines liability, if there is a reason to have a damages trial, we have a damages trial.” Thus, it cannot seriously be a surprise to any of the parties that they will once again be required to address damages in this case. Additionally, Eaton repeatedly states in its brief that Plaintiffs seek to reopen discovery “on the eve of trial.” Although that may have been true when Plaintiffs’ original motion for clarification was filed, it is no longer true. Trial ended in October 2009 and thus, when the District Court finally ruled on Plaintiffs’ motion, there was no longer any time-crunch problem. Any concern that granting Plaintiffs’ motion would prevent Eaton from being able to effectively prepare to address DeRamus’s new damages estimates at trial is no longer relevant, nor is there any risk that granting Plaintiffs’ motion would excessively delay a trial on liability.
As to the fourth factor, there is no evidence of any bad faith on the part of Plaintiffs. However, under this fourth factor, we may also consider the Plaintiffs’ justifications for failing to include alternative damages calculations in the event calculations based on the SBP were found to be insufficient. See Pennypack, 559 F.2d at 905; Gen. Dynamics Corp., 999 F.2d at 115-16. Given that DeRamus’s report already included the data necessary to develop alternate damages estimates, he could very easily have provided such estimates. Plaintiffs have provided no persuasive explanation for his failure to do so, other than that he believed his existing estimates were sufficiently reliable. It is not the district court’s responsibility to help a party correct an error or a poor exercise of judgment, and thus, Plaintiffs’ conscious choice to rely so heavily on data that was ultimately found to be unreliable weighs against a finding of abuse of discretion. This is especially true in a case such as this, where the party submitting the flawed expert report is a large corporation with significant resources represented by highly competent counsel.
However, perhaps the most important factor in this case is the critical nature of the evidence, and the consequences if permission to amend is denied. Expert testimony is necessary to establish damages in an antitrust case. As such, without additional damages calculations, it is clear that Plaintiffs will be unable to pursue damages, despite the fact that they won at the liability stage. Compare Gen. Dynamics Corp., 999 F.2d at 116-17 (finding an abuse of discretion in the district court’s exclusion of expert testimony, in part, because the total exclusion of such testimony “was tantamount to a dismissal of the [plaintiffs] ... claim”), with Sowell, 926 F.2d at 302 (finding no abuse of discretion in district court’s exclusion of proffered expert testimony, in large part, because “the record [was] totally devoid of any indication of ... how th[e] testimony might have bolstered [the plaintiffs] case,” and thus, there was “no basis whatever for believing that the admission of expert testimony would have influenced the outcome of th[e] case”). The District Court’s decision therefore would clearly influence the *300 outcome of the case. See Sowell, 926 F.2d at 302.
Significantly, in the antitrust context, a damages award not only benefits the plaintiff, it also fosters competition and furthers the interests of the public by imposing a severe penalty (treble damages) for violation of the antitrust laws. See Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 262, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (“Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress.... In enacting these laws, Congress had many means at its disposal to penalize violators. It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations. But, this remedy was not selected. Instead, Congress chose to permit all persons to sue to recover three times their actual damages.... By [so doing], Congress encouraged these persons to serve as ‘private attorneys general.’ ”) (citations omitted); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 655, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (“A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy ....”) (quotation omitted). Thus, if Plaintiffs are not able to pursue damages, not only will they be unable to recover for the antitrust injury Eaton caused, the policy of deterring antitrust violations through the treble damages remedy will also be frustrated. See Paoli II, 35 F.3d at 750 (“[T]he likelihood of finding an abuse of discretion is affected by the importance of the district court’s decision to the outcome of the case and the effect it will have on important rights.”).
In sum, after weighing the Pennypack factors and taking into account the circumstances under which Plaintiffs’ motion for clarification was ultimately denied, we conclude that the District Court abused its discretion in not permitting Plaintiffs to submit alternate damages calculations.[28]
D. Article III Standing to Seek Injunctive Relief
' Finally, we turn to Eaton’s contention that Plaintiffs lack standing to seek injunctive relief. Eaton argues that Plaintiffs’ complete withdrawal from the [¶] transmissions market in 2006 and their failure to present evidence showing anything more than a mere possibility that they will reenter the market precludes a finding of Article III standing as to injunctive relief. Although the District Court did not directly address standing, it noted in a footnote that, “[w]hile [Pjlaintiffs are no longer in business and are unable to directly benefit from an injunction, here, an injunction is appropriate because of the public’s interest in robust competition and the possibility that [P]laintiffs may one day reenter the market.” ZF Meritor LLC v. Eaton Corp., 800 F.Supp.2d 633, 639 (D.Del.2011). We agree with Eaton that this determination was improper, and we will therefore vacate the injunction issued by the District Court.[29]
*301 A plaintiff bears the burden of establishing that he has Article III standing for each type of relief sought. Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009). In order to have standing to seek injunctive relief, a plaintiff must show: (1) that he is under a threat of suffering “ ‘injury in fact’ that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical”; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury. Id. (citing Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Even if the plaintiff has suffered a previous injury due to the defendant’s conduct, the equitable remedy of an injunction is “unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]” City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); see O’Shea v. Littleton, 414 U.S. 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (“Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.”). Accordingly, a plaintiff may have standing to pursue damages, but lack standing to seek injunctive relief. Lyons, 461 U.S. at 105, 103 S.Ct. 1660.
For example, in City of Los Angeles v. Lyons, the plaintiff sued the city, seeking damages, injunctive relief, and declaratory relief, for an incident in which he was allegedly choked by police officers. Id. at 97, 103 S.Ct. 1660. The Supreme Court held that, although the plaintiff clearly had standing to seek damages, he lacked standing to seek injunctive relief because he failed to establish a “real and immediate threat” that he would again be stopped by the police and choked. Id. at 105, 103 S.Ct. 1660. “Absent a sufficient likelihood that he [would] again be wronged in a similar way, [the plaintiff] [was] no more entitled to an injunction than any other citizen of Los Angeles.” Id. at 111, 103 S.Ct. 1660. Likewise, in Summers v. Earth Island Institute, the Court held that an organization lacked standing to enjoin the application of Forest Service regulations in national parks where its members expressed only a “vague desire” to return to the affected parks. 555 U.S. at 496, 129 S.Ct. 1142. “Such some-day intentions— without any description of concrete plans, or indeed any specification of when the some day will be — do not support a finding of ... actual or imminent injury.” Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 564, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (internal marks omitted); see also Wal-Mart Stores, Inc. v. Dukes, — U.S. -, 131 S.Ct. 2541, *302 2559-60, 180 L.Ed.2d 374 (2011) (noting that employees who no longer worked for Wal-Mart lacked standing to seek injunctive or declaratory relief against WalMart’s employment practices).
Applying those principles to our case, we hold that Plaintiffs lack standing to seek an injunction. They clearly have standing to seek damages based on Eaton’s violation of the antitrust laws while ZF Meritor and Meritor were competitors. However, the ZF Meritor joint venture operationally dissolved in 2003, Meritor stopped manufacturing [¶] transmissions in 2006, and Meritor has expressed no concrete desire to revive the joint venture or otherwise reenter the market. The sole evidence in the record of Meritor’s future intentions is found in one page of trial testimony, in which a Meritor official stated that there had been internal discussions at the company about the possibility of reentry, but that no decision had been made. The official testified that Meritor “continue[d] to monitor the performance of the products that are in the marketplace!,] ... ha[d] a very thorough understanding of how the products [we]re working!,] ... and [was] actively' considering what [its] alternatives might be.” He explained, however, that upon any attempt to reenter, Meritor would be confronted with the “same obstacle that caused the dissolution of the joint venture.”[30]
As the District Court acknowledged, this evidence establishes no more than a “possibility” that Meritor might one day reenter the market. Where the District Court went wrong, however, was in concluding that such a possibility is sufficient to confer Article III standing for injunctive relief. See McCray v. Fidelity Nat’l Ins. Co., 682 F.3d 229, 242-43 (3d Cir.2012) (“Allegations of possible future injury are not sufficient to satisfy Article III.”) (internal marks and citation omitted). Plaintiffs were required to set forth sufficient facts to show that they were entitled to prospective relief, including that they were “likely to suffer future injury.” McNair v. Synapse Grp. Inc., 672 F.3d 213, 223 (3d Cir.2012) (citation omitted) (emphasis added); see McCray, 682 F.3d at 243 (explaining that “a threatened injury must be certainly impending and proceed with a high degree of certainty”) (internal marks and citation omitted). Absent a showing that they are likely to reenter the market and again be confronted with Eaton’s exclusionary practices, Plaintiffs were “no more entitled to an injunction” than any other entity that has considered the possibility of entering the [¶] transmissions market. Lyons, 461 U.S. at 111, 103 S.Ct. 1660. “Vague” assertions of desire, “without any descriptions of concrete plans,” are insufficient to support a finding of actual or imminent injury. See Summers, 555 U.S. at 496, 129 S.Ct. 1142. Although Plaintiffs claim that they might again enter the market, such a decision “w[ould] be their choice, and what that choice may be is a matter of pure speculation at this point.” McNair, 672 F.3d at 225.
Plaintiffs seem to suggest that there is a lower threshold for standing in antitrust cases.[31] However, Plaintiffs confuse the *303 doctrines of constitutional standing and antitrust standing. Although the doctrines often overlap in practice, they are, in fact, distinct. Sullivan v. D.B. Invs., Inc., 667 F.3d 273, 307 (3d Cir.2011). Regardless of any additional requirements applicable to a particular type of action, a plaintiff must always demonstrate that a justiciable case or controversy exists sufficient to invoke the jurisdiction of the federal courts. Id. Plaintiffs’ failure to do so here renders any inquiry into antitrust (statutory) standing unnecessary. See Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 225 (3d Cir.1998).
We agree with the District Court that there are strong public policy reasons for issuing an injunction in this case. However, the fact that there may be strong public policy reasons for enjoining Eaton’s behavior does not mean that Plaintiffs are the appropriate party to seek such an injunction. Standing is a constitutional mandate, Doe v. Nat’l Bd. of Med. Exam’rs, 199 F.3d 146, 152 (3d Cir.1999), and the consequences that flow from a finding of lack of standing here, although concerning, cannot affect our analysis.[32]
IV. CONCLUSION
First, we hold that Plaintiffs’ claims are not subject to the price-cost test, and instead must be analyzed as de facto exclusive dealing claims under the rule of reason. Second, we conclude that Plaintiffs presented sufficient evidence to support the jury’s finding that Eaton engaged in anticompetitive conduct and that Plaintiffs suffered antitrust injury as a result. Third, we find no error in the District Court’s decision to admit DeRamus’s testimony' on the issue of liability. Fourth, we hold that the District Court properly exercised its discretion in excluding DeRamus’s damages testimony based on his expert report, but we conclude that the District Court abused its discretion by preventing DeRamus from submitting alternate damages calculations based on data already included in his initial report. Finally, we hold that Plaintiffs lack standing to pursue injunctive relief, and therefore, we will vacate the injunction issued by the District Court. We will remand to the District Court for further proceedings consistent with this opinion.

. A third category of heavy-duty trucks, "specialty” vehicles, such as fire trucks, typically use automatic transmissions.

. At trial, Eaton disputed that it was a monopolist, but on appeal, does not challenge the jury's finding that it possessed monopoly power in the [¶] transmissions market in North America.

. ZF AG is not a party to this lawsuit.

. "External” transmission sales do not include transmissions manufactured by Volvo Group for use in its own trucks.

. Eaton did not produce a two-pedal automated mechanical transmission at the time, and would not fully release one until 2004.

.We will refer to these as "market-share” discounts or "market-penetration” discounts. It is important to distinguish such discounts from quantity or volume discounts. Quantity discounts provide the buyer with a lower price for purchasing a specified minimum quantity or volume from the seller. In contrast, market-share discounts grant the buyer a lower price for taking a specified minimum percentage of its purchases from the seller. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 768, at 169 (3d ed. 2008).

. In 2003, Freightliner and Eaton modified the agreement from a fixed 92% goal to a sliding scale, which entitled Freightliner to different rebates at different market-penetration levels.

. The share penetration targets in the Volvo LTA were lower because Volvo also manufactured transmissions for use in its own trucks. The commitment to Eaton, plus Volvo’s own manufactured products, accounted for more than 85% of Volvo’s needs.

. Although Plaintiffs brought claims under three statutes (Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act), our analysis regarding the applicability of the price-cost test is the same for all of Plaintiffs’ claims. In order to establish an actionable antitrust violation, a plaintiff must show both that the defendant engaged in anticompetitive conduct and that the plaintiff suffered antitrust injury as a result. Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 339-40, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Because a lack of anticompetitive conduct precludes a finding of antitrust injury, the key question for us is whether Eaton engaged in anticompetitive conduct. See id. at 339, 110 S.Ct. 1884 (“Antitrust injury does not arise ... until a private party is adversely affected by an anti-competitive aspect of the defendant’s conduct.”).
Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act each include an anticompetitive conduct element, although each statute articulates that element in a slightly different way. Under Section 1 of the Sherman Act, a plaintiff must establish that the defendant was a party to a contract, combination or conspiracy that “imposed an unreasonable restraint on trade." 15 U.S.C. § 1; In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314-15 (3d Cir.2010). Under Section 2, a plaintiff must demonstrate that the defendant willfully acquired or maintained its monopoly power in the relevant market. 15 U.S.C. § 2; United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). "A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits.” LePage’s Inc. v. 3M, 324 F.3d 141, 147 (3d Cir.2003) (en banc) (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 n. 32, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985)). Finally, Section 3 of the Clayton Act makes it unlawful for a person to enter into an exclusive dealing contract where the effect of such an agreement is to substantially lessen competition or create a monopoly. 15 U.S.C. § 14.
Exclusive dealing claims may be brought under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. LePage’s, 324 F.3d at 157. Additionally, the Supreme Court has held that the price-cost test is not confined to any one antitrust statute, and applies to pricing practices claims under the Sherman Act, the Clayton Act, and the Robinson-Patman Act. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222-23, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); Atl. Richfield, 495 U.S. at 339-40, 110 S.Ct. 1884. Thus, regardless of which test applies, that test is applicable to each of Plaintiffs’ claims.

. Evidence of an agreement is expressly required under Section 1 of the Sherman Act and Section 3 of the Clayton Act. See 15 U.S.C. §§ 1 and 14. However, an agreement is not necessarily required under Section 2 of the Sherman Act, which can provide a vehicle for challenging a dominant firm's unilateral imposition of exclusive dealing on customers. See 15 U.S.C. § 2; Herbert Hovenkamp, Antitrust Law'i 1821a, at 183 (3d ed. 2011).

. Despite the arguments of amicus curiae, the American Antitrust Institute, our decision in LePage’s v. 3M does not indicate otherwise. In LePage’s, we declined to apply the price-cost test to a challenge to a bundled rebate scheme, reasoning that such a scheme was better analogized to unlawful tying than to predatory pricing. See 324 F.3d at 155. In that case, the plaintiff (LePage's) was the market leader in sales of "private label” (store brand) transparent tape. Id. at 144. As LePage’s market share fell, it brought suit against 3M, alleging that 3M, which manufactured Scotch tape, some private label tape, and a number of other products, leveraged its monopoly power over Scotch brand tape and other products to monopolize the private label tape market. Id. at 145. Specifically, LePage’s challenged 3M's multi-tiered bundled rebate program, which offered progressively higher rebates when customers increased purchases across 3M’s different product lines. Id. The rebate programs also set ciistomer-specific target growth rates. Id. at 154. The sizes of the rebates were linked to the number of product lines in which the targets were met; if a customer failed to meet the target for any one product, it would lose the rebates across all product lines. Id. LePage’s could not offer these discounts because it did not sell the same diverse array of products as 3M. Id. at 155.
Relying on Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), 3M argued that its bundled rebate program was lawful because the rebates never resulted in below-cost pricing. We disagreed, reasoning that the principal anticompetitive effect of 3M’s bundled rebates was analogous to an unlawful tying arrangement: when offered by a monopolist, the rebates "may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer.” LePage’s, 324 F.3d at 155.
For several reasons, we interpret LePage’s narrowly. Most important, in light of the analogy drawn in LePage’s between bundled rebates and unlawful tying, which "cannot exist unless two separate product markets have been linked,” Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 21, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006), LePage’s is inápplicable where, as here, only one product is at issue and the plaintiffs have not made any allegations of bundling or tying. The reasoning of LePage’s is limited to cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, which conditions the rebates on purchases across multiple different product lines. Accordingly, we join our sister circuits in holding that the price-cost test applies to market-share or volume rebates offered by suppliers within a single-product market. See NicSand, Inc. v. 3M Co., 507 F.3d 442, 452 (6th Cir.2007); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1061 (8th Cir.2000); Barry Wright Corp. v. 724 Grinnell Corp., 724 F.2d 227, 236 (1st Cir.1983).
Additionally, several of the bases on which we distinguished Brooke Group have been undermined by intervening Supreme Court precedent, which counsels caution in extending LePage’s. For example, we indicated in LePage's, 324 F.3d at 151, that Brooke Group might be confined to the Robinson-Patman Act, but the Supreme Court has made clear that the standard adopted in Brooke Group also applies to predatory pricing claims under the Sherman Act. Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 318 n. 1, 127 S.Ct. 1069, 166 L.Ed.2d 911 (2007). Additionally, LePage’s, 324 F.3d at 151-52, suggested that Broo/ce Group is not applicable in cases involving monopolists, but the Supreme Court has since applied Brooke Group’s price-cost test to claims against a monopolist, Pac. Bell Tel. Co. v. Linkline Commc’ns, Inc., 555 U.S. 438, 447-48, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009), and a monopsonist, Weyerhaeuser, 549 U.S. at 320-25, 127 S.Ct. 1069. Finally, we observed in LePage’s that, in the years following Brooke Group, the Supreme Court had only cited the case four times (and for unrelated propositions), but since LePage’s, the Court has reaffirmed and extended Brooke Group. See Linkline, 555 U.S. at 447-48, 129 S.Ct. 1109; Weyerhaeuser, 549 U.S. at 325, 127 S.Ct. 1069. In doing so, the Court emphasized the importance of Brooke Group in light of "developments in economic theory and antitrust jurisprudence,” and downplayed the significance of seemingly inconsistent circuit court antitrust precedent from the 1950s and 1960s, some of which we referenced in LePage’s. *275 See Linkline, 555 U.S. at 452 n. 3, 129 S.Ct. 1109.

. Monopsony power is market power on the buy (or input) side of the market. Weyerhaeuser, 549 U.S. at 320, 127 S.Ct. 1069. "As such, a monopsony is to the buy side of the market what a monopoly is to the sell side[.]” Id. (citing Roger Blair & Jeffrey Harrison, Antitrust Policy and Monopsony, 76 Cornell L.Rev. 297, 301, 320 (1991)). *281 trust injury in a pricing practices case, Section 1 is no different than, for example, the plaintiff's allegation in Cargill, Inc. v. Monfort of Colorado, Inc. that the defendants' unlawful merger under Section 7 of the Clayton Act caused antitrust injury. Id. at 340, 110 S.Ct. 1884 (citing Cargill, 479 U.S. at 116, 107 S.Ct. 484) ("To be sure, the source of the price competition in the instant case was an agreement allegedly unlawful under § 1 of the Sherman Act rather than a merger in violation of § 7 of the Clayton Act. But that difference is not salient.”). Moreover, Atlantic Richfield was decided before LePage's and we did not interpret the "regardless of the type of antitrust claim involved” language as mandating the application of the price-cost test to 3M's bundled rebates.

. Eaton also relies heavily on the Supreme Court's statement in Atlantic Richfield v. USA Petroleum Co. that price-cost principles apply "regardless of the type of antitrust claim involved.” 495 U.S. at 340, 110 S.Ct. 1884. When read in context, however, it is clear that this statement means that the price-cost test applies regardless of the statute under which a pricing practices claim is brought, not that the price-cost applies regardless of the type of anticompetitive conduct.
In Atlantic Richfield, the'plaintiffs argued that no showing of below-cost pricing was required to establish antitrust injury for a claim of illegal price-fixing under Section 1 of the Sherman Act because the price agreement itself was illegal, and any losses that stem from such an agreement, by definition, flow from that which makes the defendant's conduct unlawful. Id. at 338, 110 S.Ct. 1884. The Supreme Court rejected that argument, reasoning that although price-fixing is unlawful under Section 1, a plaintiff does not suffer antitrust injury unless it is adversely affected by an anticompetitive aspect of the defendant's conduct, and "in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect.” Id. at 339, 110 . S.Ct. 1884 (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)) (additional citations omitted). It was in this in context, in rejecting an argument that Section 1 was somehow exempt from the price-cost test, that the Supreme Court made the broad statement that it has "adhered to ... [price-cost] principle^] regardless of the type of antitrust claim involved.” See id. at 340, 110 S.Ct. 1884.
The Court's discussion following this statement supports our interpretation. The Court went on to explain that, for purposes of determining whether a plaintiff has suffered anti-

. Our dissenting colleague objects to the phrase "de facto partial exclusive dealing” as constituting a creative neologism that "distorts the English language” and infrequently appears in a search of an online legal database. Dissenting Op., Part II. "De facto partial exclusive dealing” is certainly a neologism, but it also accurately represents that an exclusive dealing claim does not require a contract that imposes an express exclusivity obligation, Tampa Elec., 365 U.S. at 326, 81 S.Ct. 623; Dentsply, 399 F.3d at 193; Le-Page’s, 324 F.3d at 157, nor a contract that covers 100% of the buyer's needs, Tampa Elec., 365 U.S. at 328, 81 S.Ct. 623 ("[T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market.”) (emphasis added).

. In 2003, for example, PACCAR failed to meet its market penetration target, and although Eaton withdrew all contractual savings, it did not terminate the agreement.

. Additionally, the District Court instructed the jury that Plaintiffs did not allege "actual” exclusive dealing, but instead alleged that "the long-term supply contracts with defendant, in effect, committed the OEMs to purchase at least a substantial share of their transmissions from defendant.” The District Court defined such an arrangement as a " 'de facto’ exclusive dealing contract.” Eaton does not challenge this instruction on appeal.

. Eaton emphasizes that the OEMs are multi-billion dollar companies (or at least owned by multi-billion dollar parent companies), and therefore claims that the OEMs dictated terms to Eaton — not the other way around. Signifi- ■ cantly, in United States v. Dentsply International, Inc., we found coercion even though the relationship between the customers and the defendant was not totally one-sided. 399 F.3d 181, 185 (3d Cir.2005) (noting that the defendant considered bypassing dealers and selling directly to customers but abandoned that strategy out of fear that dealers might retaliate by refusing to buy other products manufactured by the defendant). Moreover, even assuming that the evidence could support a conclusion that the OEMs had more power in the relationship, the fact that two reasonable conclusions could be drawn from the evidence does not make the jury's adoption of Plaintiffs’ view unreasonable.

. ZF Meritor’s expert, Dr. David DeRamus, testified at trial that Eaton’s market share was consistently above 80% from 2000 through 2007. Later in his testimony, DeRamus concluded that Eaton’s increased market share from 2000 to 2007 was the result of the LTAs. Furthermore, DeRamus showed that ZF Meritor’s market share percentages in the linehaul transmissions market (i.e., the only portion of the overall HD transmissions market in which ZF Meritor competed), dropped from 32% to 24% between 2000 and 2002, and dropped even further from 24% to 12% between 2002 and 2003, before ultimately falling to 0% in 2007. DeRamus concluded that the loss of ■ ZF Meritor’s linehaul transmissions market share and its eventual exit from the market were due to Eaton's conduct and, specifically, the LTAs.

. Eaton and Freightliner revised their original LTA to increase the duration to ten years.

. Judge Greenberg, in dissent, objects that our rule of reason analysis fails to consider that Eaton's prices were above cost. Dissenting Op., Part II. However, contrary to this objection, and even though ZF Meritor does not contend that Eaton’s prices operated as an exclusionary tool, we do not view Eaton's prices as irrelevant to the rule of reason analysis. Rather than analyzing the alleged exclusionary provisions in a vacuum, we analyze these provisions in the larger context of the LTAs as a whole, and we recognize that Eaton maintained above-cost prices. We conclude that ZF Meritor presented sufficient evidence for the jury to find that, even though not every provision was exclusionary, the LTAs as a whole functioned as exclusive dealing agreements that adversely affected competition.

. It is worth noting that despite Eaton's contention that Plaintiffs’ higher prices and quality problems led to their decline in market share, the OEMs felt differently. In 2002, a Freightliner executive wrote: "[tjhis is a dangerous situation. We have already killed Meritor’s transmission business. It is just a matter of time before they close their doors.” Likewise, a 2006 Volvo presentation states: "With all its OEM customers, Eaton has established long term supply contracts ... [which] ha[ve] led to ... Eaton’s only North American competitor, Meritor, [being] gradually marginalized to its current market position with a 10% market share.”

.Eaton also argues that DeRamus’s testimony was contrary to law because he did not employ a price-cost test. However, as we explained above, no price-cost test was required in this case.

. The SBP contained a five-year forecast of profit and loss estimates based on estimated unit sales, unit prices, manufacturing costs, operating expenses, and other considerations.

. As the District Court noted, it is especially important for an expert to identify and justify the assumptions underlying financial projections when dealing with a new company. Here, although Meritor had been in the [¶] transmissions industry for over a decade, ZF Meritor was offering a brand new line of transmissions that had never before been sold in the North American market.

. We base our affirmance of the District Court's decision entirely on the fact that DeRamus's opinion failed Rule 702, and do not decide whether Rule 703 provides an additional basis for exclusion. We note, however, that Plaintiffs' argument that Rule 703 somehow constrains a district court's ability to conduct an assessment of reliability under Rule 702 is misplaced. After all, a piece of evidence may be relevant for one purpose, and thus admissible at trial, but not be the type of information that can form the basis of a reliable expert opinion. As the District Court stated, “the fact that [a piece of evidence] [i]s part of [the] plaintiffs' 'story' does not mean, ipso facto,” that an expert opinion relying on such evidence is admissible. ZF Mentor LLC v. Eaton Corp., 800 F.Supp.2d 633, 637 (D.Del.2011).

. Although the District Court did not address DeRamus’s lost enterprise value calculations, Plaintiffs indicated in their motion for clarification that DeRamus could make similar revisions to those calculations.

. It is unclear from the record why sixteen months passed between Eaton's motion and the District Court's decision on the motion.

. We express no opinion as to the reliability or admissibility of DeRamus’s alternate damages calculations. That is a matter left to the District Court on remand. However, we note that Plaintiffs' motion for clarification only sought to include damages calculations based on data already in the expert report, and that fact is crucial to our holding that prejudice to Eaton can be easily cured. Nothing in our opinion should be read as requiring the District Court to allow Plaintiffs to bring in entirely new data for the revised damages estimates.

. Even though Meritor was still technically in the [¶] transmissions business at the time the complaint in this case was filed, it is still *301 appropriate to frame this issue as one of standing, rather than one of mootness. Plaintiffs’ complaint, which was filed on October 5, 2006, stated that Meritor intended to exit the [¶] transmissions business in January 2007, and did not indicate any intent to reenter. Thus, even at the time the complaint was filed, Plaintiffs could not demonstrate the requisite likelihood of future injury sufficient to confer standing. See Davis v. F.E.C., 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) ("[T]he standing inquiry [is] focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.”) (citations omitted); U.S. Parole Comm’n v. Geraghty, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (“The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).”) (citation omitted). Moreover, even if we treated this as a mootness question, our conclusion would remain the same.

. In a post-trial status conference, the District Court asked Plaintiffs’ counsel why an injunction would be appropriate given that Plaintiffs were no longer in the business. Plaintiffs’ counsel could give no more concrete information about Plaintiffs' plans than the witness, stating simply that, if Eaton’s conduct was enjoined, "a different set of calculations” would apply to Plaintiffs’ discussions regarding reentry into the market.

. Specifically, Plaintiffs argue that the appropriate standard is found in Section 16 of the Clayton Act, which provides that any person "shall be entitled to sue for and have injunctive relief ... against threatened loss or *303 damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief ... is granted by courts of equity.” 15 U.S.C. § 26.

. Because we conclude that Plaintiffs lack standing to pursue injunctive relief, we need not address Plaintiffs’ argument that the District Court erred by refusing to allow them to address the scope of injunctive relief.

. Throughout this dissent I use the same standard of review that the majority sets forth. Thus while I am exercising plenary review of the order denying the motion for a judgment as a matter of law within that review I am being deferential to the jury verdict.